## S08P0916. O'KELLEY v. THE STATE.

### (670 SE2d 388)

CARLEY, Justice.

A jury found Dorian Frank O'Kelley guilty of two counts of malice murder in connection with the deaths of Susan Pittman and her thirteen-year-old daughter, Kimberly Pittman. The jury also found O'Kelley guilty of two counts each of burglary and of arson in the first degree, one count of cruelty to children, one count of possession of a controlled substance, and five counts of entering an automobile with intent to commit a theft. The jury recommended a death sentence for the murder of Susan Pittman based on the following statutory aggravating circumstances: the murder was committed while the defendant was engaged in the commission of a burglary; the murder was committed while the defendant was engaged in the commission of arson in the first degree; and the murder was outrageously or wantonly vile, horrible, or inhuman in that it involved torture and an aggravated battery to the victim and involved the depravity of mind of the defendant. OCGA § 17-10-30 (b) (2), (7). The jury also recommended a death sentence for Kimberly Pittman's murder based on its finding of these same statutory aggravating circumstances and, in addition, a finding that her murder was committed while the defendant was engaged in the commission of another capital felony, namely, the murder of Susan Pittman. OCGA § 17-10-30 (b) (2), (7). The trial court entered judgments of conviction and sentences in accordance with the jury's verdicts and recommendations. O'Kelley's motion for new trial was denied, and he appeals. For the reasons set forth below, we affirm the convictions in part and reverse in part with direction, and we affirm the death sentences.[*]

---

[*] The victims were murdered on April 11, 2002. A Chatham County grand jury indicted O'Kelley on June 5, 2002, for the following: two counts of malice murder; two counts of burglary, one of which was unrelated to the murders; one count of cruelty to children; two counts of arson in the first degree; five counts of entering an automobile with intent to commit a theft, which were unrelated crimes that occurred on April 12, 2002; and one count of possession of a controlled substance with intent to distribute. The State filed written notice of its intent to seek the death penalty on June 17, 2002. O'Kelley's trial began on October 21, 2005, and the jury convicted him on all counts as charged except as to the count of possession of a controlled substance with intent to distribute, on which they found him guilty only of possession. The jury recommended death sentences for the murders on November 8, 2005. In addition to the death sentences, the trial court imposed the following sentences to be served consecutively to the death sentences and to each other: twenty-year sentences for each of the two counts of arson in the first degree, the one count of cruelty to children, and the two burglaries; a fifteen-year sentence for the one count of possession of a controlled substance; and five-year sentences for each of the five counts of entering an automobile. O'Kelley filed a motion for new trial on December 5, 2005, and amended it on March 6, 2007 and July 27, 2007. The amended motion was denied on January 8, 2008. O'Kelley filed a timely notice of appeal

1. The evidence presented at trial shows that, shortly before midnight on April 10, 2002, O'Kelley and his co-defendant, Darryl Stinski, were observed at a convenience store by two Chatham County police officers. The officers noticed the defendants because they were dressed in black clothing, they carried a black duffle bag that appeared empty, and Stinski had several facial and ear piercings. Shortly after O'Kelley and Stinski left the store, the officers responded to a burglar alarm at a residence within walking distance of the store and discovered a broken window there. The occupant of the residence, who was not home at the time, testified at trial that she returned to find that someone had apparently tried to kick in her back door and had broken a window and bent the curtain rod inside the home. O'Kelley admitted in his first statement to police that he and Stinski went to a residence in order to commit a theft therein on the night in question but fled after the alarm went off.

A few hours later, at approximately 5:30 a.m. on April 11, the same police officers were leaving the convenience store when they spotted a fire in the distance. Rushing to the scene, they found the Pittman residence engulfed in flames. This home was in close proximity to the residence which had been burglarized earlier. In the headlights of the police car, one of the officers again observed O'Kelley and Stinski, this time standing in a wooded area across the street from the burning house. However, they had disappeared by the time the officers exited the vehicle. Once the fire was extinguished, officials discovered the remains of the victims.

That evening, O'Kelley and Stinski brought a duffle bag to the mobile home where Stinski was staying, and O'Kelley told the group of people present that he and Stinski had stolen items from automobiles in the neighborhood. He also confided in one member of the group that he had burglarized and set fire to the Pittman residence, and he claimed to have slit Ms. Pittman's throat and to have raped Kimberly. O'Kelley then removed from his wallet a tooth in a ziplock bag and stated that he had "busted it out of the little girl's mouth." After O'Kelley and Stinski left the mobile home, the group opened the duffle bag and discovered several items, including compact discs marked with Kimberly's initials and prescription pill bottles containing oxycodone with Ms. Pittman's name and address on the labels. A group member phoned the police and advised them of the bag's contents and O'Kelley's comments. After the contents of the bag were identified by a family member as belonging to the victims, O'Kelley and Stinski were arrested, and a human tooth later

on February 6, 2008. This appeal was docketed on February 12, 2008, and was orally argued on May 19, 2008.

determined through DNA evidence to belong to Kimberly was found inside O'Kelley's wallet.

In his second statement to police, O'Kelley confessed to killing Ms. Pittman by repeatedly beating and stabbing her, to beating and stabbing Kimberly, to setting the Pittman residence on fire while Kimberly was still alive, and to taking numerous items from the residence. O'Kelley told police that items stolen from the home and from automobiles in the neighborhood were located in the attic of his house and that he had discarded the clothing and shoes that he was wearing during the murders in a garbage bag on top of an abandoned mobile home near his house. Police located these items as O'Kelley described. Blood on the clothing was identified as Ms. Pittman's, and blood on the shoes was identified as that of both victims.

Four witnesses testified that, early on the day following the murders, they discovered that someone had broken into and re-moved personal belongings from their automobiles parked in O'Kelley's neighborhood. O'Kelley's fingerprint was found inside one of these vehicles, and the witnesses identified their stolen property from items recovered by the police from O'Kelley's attic. After reviewing the evidence in the light most favorable to the jury's verdict, we conclude that there was sufficient evidence for a rational trier of fact to find beyond a reasonable doubt that O'Kelley was guilty of the crimes for which he was convicted, including the first burglary during which the alarm was triggered. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). See also *Gude v. State*, 213 Ga. App. 573-574 (1) (445 SE2d 355) (1994) (finding evidence sufficient to prove an entry to support appellant's burglary conviction where blood was found inside a broken window, curtains were hanging outside as if pulled through the broken window, and part of appellant's jersey was hanging from inside window); *Mullinnix v. State*, 177 Ga. App. 168 (338 SE2d 752) (1985) (finding evidence sufficient to prove an entry with intent to commit theft where, when responding to silent alarm, police found defendant hiding outside the door with burglar tools and the trip string to the silent alarm device, which could not have been removed without inserting an instrument in the open door knob hole because the door was locked by a deadbolt).

The trial court erred, however, by not merging for sentencing the two first degree arson counts. Count 5 charged O'Kelley with first degree arson committed by knowingly damaging by fire the dwelling house of Susan Pittman under OCGA § 16-7-60 (a) (1), and Count 6 charged him with first degree arson committed by knowingly dam-aging by fire the same structure on the same date as Count 5 under such circumstances that it was reasonably foreseeable that human life might be endangered under OCGA § 16-7-60 (a) (5). Although

the evidence shows that O'Kelley set the Pittman residence afire by setting multiple fires in succession throughout the house, his conduct constituted one act of arson, that of the burning of the Pittman residence. Thus, there is only one crime of arson in the first degree. *Altman v. State*, 156 Ga. App. 185, 186 (1) (273 SE2d 923) (1980). The trial court erred in imposing two consecutive twenty-year sentences for the single first degree arson offense and is directed to strike the sentence imposed on Count 6.

2. O'Kelley contends that the trial court erroneously qualified six potential jurors based upon their views on sentencing.

> The proper standard for determining the disqualification of a prospective juror based upon his views on capital punishment "is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " [Cits.] On appeal, the relevant inquiry is whether the trial court's qualification of the prospective juror is supported by the record as a whole. [Cit.] An appellate court must pay deference to the finding of the trial court; this deference includes the trial court's resolution of any equivocations or conflicts in the prospective juror's responses on voir dire. [Cit.] "Whether to strike a juror for cause is within the discretion of the trial court and the trial court's rulings are proper absent some manifest abuse of discretion." [Cit.]

*Nance v. State*, 272 Ga. 217, 222 (6) (526 SE2d 560) (2000).

(a) *Prospective juror Hopkins.* This juror was not substantially impaired merely because he expressed a leaning toward either the death penalty or a life sentence without parole in the event that a defendant was found guilty of an "intentional killing without a justification in an aggravated fashion." See *Pace v. State*, 271 Ga. 829, 834 (7) (524 SE2d 490) (1999) (stating that "[a] prospective juror is not subject to excusal for cause for merely leaning for or against a death sentence"). A review of Mr. Hopkins' voir dire shows that he stated that, under those same circumstances, "[a]s an open-minded adult," he could reasonably consider the sentence of life with the possibility of parole, and he indicated several times that he could consider all three sentencing options. See *Mize v. State*, 269 Ga. 646, 652 (6) (d) (501 SE2d 219) (1998). Considering the entirety of Mr. Hopkins's voir dire, we find that the trial court was authorized to find him qualified to serve.

(b) *Prospective juror Carter.* O'Kelley claims that this juror should have been excused for cause because he expressed support for the death penalty during his successful campaign for election as a

state representative and because he stated on his juror questionnaire that "if [O'Kelley] is guilty, he should get the death sentence." During voir dire, Mr. Carter explained that his intent in completing his juror questionnaire as he did "was simply to say that if the evidence [wa]s overwhelming, that [he] would not hesitate to impose the death penalty." However, Mr. Carter repeatedly indicated that he would consider all three sentencing options, and he specifically stated that he could consider a sentence of life with the possibility of parole where an intentional murder with aggravating circumstances was found. Mr. Carter was not unqualified because he "expressed a leaning for or against a particular sentence for a convicted murderer," as he was not "irrevocably committed to voting against one of the three possible sentences." *Lewis v. State*, 279 Ga. 756, 760 (3) (a) (620 SE2d 778) (2005). Moreover, while Mr. Carter acknowledged that he would want his constituents to know that he favored the death penalty or a life without parole sentence and that he "care[d] very much about public service and . . . [his] political career," he stated that "[he] would sacrifice that to do the right thing." Viewing the record as a whole and giving deference to the trial court's finding that "[Mr. Carter] said he cannot do something against his convictions . . . despite his political aspirations," we conclude that the trial court was authorized to find that Mr. Carter's views on capital punishment would not substantially impair his ability to perform his duties as a juror in accordance with his instructions and his oath. See *Pace v. State*, supra at 834 (7).

(c) *Prospective juror Biskup.* A qualified panel of forty-two jurors is required to select a jury in a death penalty trial, allowing for twelve jurors plus fifteen strikes for each side. OCGA § 15-12-165. The State and the defense were each allotted four additional peremptory challenges for the purpose of selecting four alternate jurors. OCGA § 15-12-169. While the trial court acknowledged that a panel of fifty-four jurors was required for selection of the jury and four alternates, it insisted on qualifying sixty prospective jurors. Any error regarding a juror qualified fifty-fifth or later on the panel of sixty is harmless in this case because, even if both sides used all their allotted strikes, it would be impossible for those jurors to be reached during the selection of either the jury or the alternate jurors. See *Pope v. State*, 256 Ga. 195, 202 (7) (e) (345 SE2d 831) (1986), overruled on other grounds by *Nash v. State*, 271 Ga. 281 (519 SE2d 893) (1999).

Our review of the record shows that Mr. Biskup was the fifty-eighth qualified juror. We therefore conclude that any error in failing to excuse him was harmless because he "was not necessary to the selection of the jury or the [four] alternates, and whether or not he was excused had no effect on the trial." *Fugate v. State*, 263 Ga.

260, 264 (6) (431 SE2d 104) (1993) (finding no reversible error in trial court's failure to excuse a potential juror who was number sixty on the qualified panel). We note, however, that while it appears that the venire members were called in the order set by the jury clerk, we cannot determine that with absolute certainty, as the trial court utilized the "silent strike" method of selecting a jury and the actual selection procedure has not been preserved in the record. We remind trial courts that the Unified Appeal Procedure requires that in all death penalty trials "a *complete transcript* of all phases of the case" be filed in the record and that "the term 'complete transcript' " includes "a complete transcription" of "the striking" of the jurors. (Emphasis in original.) U.A.P. IV (A) (1). Nevertheless, even assuming our reconstruction of the order in which the jurors were struck is incorrect, we find no error.

Mr. Biskup indicated from the outset of his voir dire that he could consider all three possible sentencing options and that he could keep an open mind and listen to all the evidence, including mitigating evidence, before making a decision as to the appropriate sentence. Despite those responses, Mr. Biskup gave some conflicting answers regarding his willingness to factor specific instances of mitigating evidence into his sentencing decision that, considered alone and out of context, could indicate an inability on his part to give due consideration to mitigating evidence. However, it is clear from our review of the entire transcript that Mr. Biskup initially did not understand what constituted mitigating evidence or that a juror was required to consider mitigating evidence in determining the appropriate sentence. Once those matters were sufficiently explained to him, he reiterated that he would realistically factor any mitigating evidence presented to him into his decision-making process in determining the appropriate sentence. Because "[h]is testimony as a whole . . . does not indicate a predisposition to recommend a sentence of death or that he would not consider proper mitigating evidence if instructed to do so[,]" the trial court did not abuse its discretion by concluding that he was qualified to serve as a juror. *Jenkins v. State*, 269 Ga. 282, 289 (8) (c) (498 SE2d 502) (1998).

(d) *Prospective jurors Martin, Gnann, and Lanier.* Our review shows that these jurors were also not among the first forty-two prospective jurors to be qualified on the panel. However, as they also were not among those qualified fifty-fifth or later on the panel of sixty, they were on the panel from which alternate jurors were selected. Because, in O'Kelley's case, one alternate juror served in the sentencing phase, it is necessary to determine whether the trial court erred in refusing to strike these challenged jurors for cause. Compare *Heidler v. State*, 273 Ga. 54, 57 (3) (c) (537 SE2d 44) (2000)

(finding that any error as to the qualification of alternate jurors was not harmful where no alternates were needed during the trial).

Our review of their voir dire shows that Mr. Gnann and Ms. Lanier were initially somewhat confused about the bifurcated trial procedure, the three sentencing options, and the consideration of mitigating evidence. However, once these matters were explained to them, they stated repeatedly that they could listen to the evidence and consider all three sentencing options. The trial court did not err by qualifying these jurors. See *Bishop v. State*, 268 Ga. 286, 290 (6) (486 SE2d 887) (1997) (holding that prospective juror's initial statement that he would always vote for a death sentence did not require his disqualification in light of his responses once the bifurcated trial was explained to him). Compare *Nance*, supra at 222-224 (6) (finding reversible error where trial court qualified a prospective juror who indicated she could listen to the law and the facts and choose the appropriate sentence but whose other responses made clear she believed "the appropriate sentence" would always be a death sentence).

While Ms. Martin expressed her "personal feeling" against the sentence of life with the possibility of parole, she also stated that, "to be fair, [she] would have to probably consider all three [sentencing] possibilities," that she would consider any mitigating evidence offered in making the determination on sentencing, and that, under the right circumstances, she could consider the sentence of life with the possibility of parole. Considering the entirety of Ms. Martin's voir dire, the trial court was authorized to find her qualified to serve. See *Carr v. State*, 267 Ga. 547, 554 (6) (a) (480 SE2d 583) (1997) (stating that "[t]he relevant issue is whether the juror has the ability to consider mitigating evidence and the option of a life sentence").

(e) *"Talismanic" rehabilitation of challenged jurors.* Citing *Morgan v. Illinois*, 504 U. S. 719 (112 SC 2222, 119 LE2d 492) (1992), for the proposition that general questions about whether a juror would follow the law are not adequate in voir dire, O'Kelley contends that the trial court conducted an improper "talismanic" rehabilitation of the challenged jurors. See generally *Kim v. Walls*, 275 Ga. 177, 178 (563 SE2d 847) (2002). However, the record shows that the questions the trial court asked of the prospective jurors were not the type of "general fairness and 'follow the law' questions" condemned in *Morgan v. Illinois*, supra at 734 (II) (D). See *Morgan v. Illinois*, supra at 724 (I) (" 'Do you know of any reason why you cannot be fair and impartial?' "; " 'Do you feel you can give both sides a fair trial?' "). Rather, the trial court explicitly asked the jurors whether, "if the evidence show[ed] aggravating circumstances, and the defendant [were] found guilty of murder," the jurors could consider all three sentencing options, and, in particular, a sentence of life with

the possibility of parole. The jurors qualified by the trial court indicated several times that, under those circumstances, they could consider the sentence of life with the possibility of parole. We conclude that the trial court's targeted questions to the challenged jurors aided the court in resolving the equivocations and conflicts in their responses. *Bishop v. State*, supra at 290-291 (6). See also *Oken v. Corcoran*, 220 F3d 259, 266 (II) (A) (2) (4th Cir. 2000) (stating that the trial court's questions explicitly referring to the death penalty and asking whether a potential juror's feelings about the death penalty were "strong" were not the sort of questions held inadequate in *Morgan v. Illinois*). Moreover, the trial court allowed O'Kelley ample opportunity to question the challenged jurors regarding matters such as whether they could consider mitigating evidence and whether they could ever vote for life with the possibility of parole. Compare *Morgan v. Illinois*, supra at 734-735 (noting that the defense was not permitted to ask follow-up questions). Therefore, this enumeration is without merit.

3. After the State presented its sentencing phase evidence, defense counsel requested permission to make an opening statement before presenting evidence for the defense. The trial court initially responded affirmatively. However, the prosecutor objected, declaring to the trial court that, because the State had not presented an opening statement, defense counsel was not entitled to make one. The State further argued that the law did not provide for opening statements in the sentencing phase of death penalty trials and that it was the local custom to provide for them solely in those cases in which there was only a trial as to sentencing, where the parties did not have the opportunity to make opening statements at the beginning of the guilt/innocence phase. After hearing from both parties, the trial court sustained the State's objection. O'Kelley contends that the trial court erred in denying his request and that the error was not harmless.

Opening statements in the sentencing phase of a death penalty trial are not specifically required by "statute, rule, or caselaw." *Smith v. State*, 270 Ga. 240, 250 (15) (510 SE2d 1) (1998). However, we have noted on more than one occasion that "we think it is the better practice to allow the parties to outline for the jury their expected evidence in aggravation or mitigation." *Smith v. State*, supra at 250 (15). See also *Wilson v. State*, 271 Ga. 811, 818 (8) (525 SE2d 339) (1999). Furthermore, in recognition of the importance of opening statements to the trial process, this Court has promulgated a rule entitled, "Opening Statements in Criminal Matters." Uniform Superior Court Rule (USCR) 10.2. That rule provides that "[d]efense counsel may make an opening statement immediately after the

state's opening statement and prior to introduction of evidence, or following the conclusion of the state's presentation of evidence."

The primary rationale for the opening statement is "to inform the jury in a general way of the nature of the action and defense so that they may better be prepared to understand the evidence." *Best v. Dist. of Columbia*, 291 U. S. 411, 415 (54 SC 487, 78 LE 882) (1934). See also *Sims v. State*, 251 Ga. 877, 879 (3) (311 SE2d 161) (1984) (stating that "the opening statement is of no small significance in that it outlines for the jury what a party intends to show at trial").

> [T]he real importance of the opening statement is to provide notice to the jury: to apprise the jurors of a factual context in which to assimilate and integrate the evidence as it unfolds during the trial and to enable them to perform better their sworn role as deciders of the facts. [Cits.] Nothing else in the course of the trial does the same.

James R. Lucas, *Opening Statement*, 13 U. Haw. L. Rev. 349, 350 (1991). We find that this rationale applies as well to the sentencing phase of a death penalty trial.

While the defendant in a bifurcated trial has the opportunity to make an opening statement at the beginning of the guilt/innocence phase, only evidence relevant to whether the defendant committed the charged offense is considered during that phase. Indeed, " '[t]he bifurcated trial was created to withhold matters inadmissible on the issue of guilt or innocence from the jury until that issue ha[s] been determined.' " *Smith v. State*, 236 Ga. 12, 20 (6) (222 SE2d 308) (1976). See also *Gregg v. Georgia*, 428 U. S. 153, 190-192 (IV) (A) (96 SC 2909, 49 LE2d 859) (1976) (suggesting that a bifurcated trial procedure most effectively reduces the influence of irrelevant, prejudicial factors in guilt determinations in death penalty trials). Moreover, unlike in the sentencing phase, the defendant enters the guilt/innocence phase of the trial presumed innocent. Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, 4th Ed., § 1.20.10.

Only if a guilty verdict is returned on a capital offense does the trial proceed to a separate sentencing phase. The jury may consider evidence from the guilt/innocence phase when determining the appropriate sentence. *Blankenship v. State*, 251 Ga. 621, 624 (308 SE2d 369) (1983). However, the purpose of the sentencing phase is to introduce different evidence of the convicted "defendant's background and character — what it is *about him* that the jury should consider in deciding whether to spare his life." (Emphasis in original.) *Barnes v. State*, 269 Ga. 345, 360 (27) (496 SE2d 674) (1998). Because the defendant stands in a different position with respect to guilt or innocence in each phase and because the separate

phases have differing purposes, frequently counsel's strategies in each phase conflict. For instance, it is not uncommon for a convicted defendant who pled not guilty in the guilt/innocence phase of his death penalty trial to present in the sentencing phase mitigating evidence, such as evidence of remorse and certain psychological evidence, that would have jeopardized his defense if presented at the guilt/innocence phase. See *Muhammad v. State*, 282 Ga. 247, 253 (3) (c) (647 SE2d 560) (2007) (noting that a "defendant may never intend to disclose a helpful sentencing phase witness who could be a harmful guilt/innocence phase witness").

Furthermore, once a guilty verdict has been returned, "it is 'desirable for the jury to have as much information before it as possible when it makes [a] sentencing decision.' " *Barnes v. State*, supra at 358 (27) (quoting *Gregg v. Georgia*, supra at 204 (IV) (B) (2)). In furtherance of this policy, Georgia law "is permissive with regard to the scope of mitigating evidence that a jury may consider in the sentencing phase," and there are many types of evidence and witnesses that are admissible in the sentencing phase that are inadmissible in the guilt/innocence phase. *Barnes v. State*, supra at 358-359 (27) (listing some of the numerous types of mitigating evidence that are admissible in the sentencing phase of a death penalty trial). See also *Height v. State*, 278 Ga. 592, 595-596 (1) (604 SE2d 796) (2004) (holding that unstipulated polygraph test results, while not admissible in the guilt/innocence phase of a death penalty trial, may be admissible in the sentencing phase if the trial court determines that they are sufficiently reliable); *Green v. Georgia*, 442 U. S. 95, 97 (99 SC 2150, 60 LE2d 738) (1979) (holding that the hearsay rule may not be applied mechanistically in the sentencing phase of a capital trial); *Brown v. State*, 235 Ga. 644, 649 (3) (220 SE2d 922) (1975) (holding that a defendant does not have to forfeit his right to remain silent during the guilt/innocence phase in order to preserve his option to testify in the sentencing phase regarding circumstances surrounding the crime as evidence in mitigation of punishment).

As a result, in almost all instances it would in reality not only be illogical and counterproductive, but also impossible for a defendant effectively to outline his sentencing phase defense and disclose his mitigation witnesses to the jury in his opening statement at the guilt/innocence phase. See USCR 10.2; *McMillan v. State*, 257 Ga. 173, 175 (7) (356 SE2d 866) (1987) (stating that "[an opening] statement should be confined to admissible evidence"). Without the opportunity to make an opening statement at the sentencing phase, a defendant is left without the means to provide a roadmap to guide the jurors during the presentation of his mitigating evidence. This is not an insignificant deprivation, given the complexity of many

mitigation defenses and the fact that, in many death penalty trials, the defendant's focus is not so much on his guilt or innocence as it is on why a death sentence should not be imposed on him.

This Court has both the inherent power necessary "to maintain a court system capable of providing for the administration of justice in an orderly and efficient manner," *Garcia v. Miller*, 261 Ga. 531, 532 (3) (408 SE2d 97) (1991), and the authority to make rules to "provide for the . . . efficient . . . resolution of . . . prosecutions." Ga. Const. of 1983, Art. VI, Sec. IX, Par. I. Under those inherent and rule-making powers, we hold that the sentencing phase of a trial in which the State is seeking the death penalty is a "criminal matter[ ]" within the scope of USCR 10.2 and, therefore, that a death penalty defendant is entitled to make an opening statement in the sentencing phase. To the extent that *Wilson v. State*, supra, and *Smith v. State*, 270 Ga., supra, imply otherwise, they are overruled.

While we have previously held "that the trial court may rule in its discretion whether the defendant's opening statement shall be made following the state's opening statement or at the conclusion of the state's case[,]" that holding was based on the fact that, at that time, " 'there [was] no statute or rule of court as to the time at which defense counsel in a criminal case may make his opening statement.' [Cits.]" *Berryhill v. State*, 235 Ga. 549, 550 (3) (221 SE2d 185) (1975). However, with the adoption of the Uniform Superior Court Rules, which became effective on July 1, 1985, that ceased to be the case, as Rule 10.2 directly addresses the time at which counsel may make an opening statement. See Uniform Rules for the Superior Court, 253 Ga. 800, 824 (1985). That rule clearly provides a defendant with the option of making an opening statement either immediately after the State's opening or at the conclusion of the State's presentation of evidence. USCR 10.2; *Mason v. State*, 197 Ga. App. 534, 535 (1) (398 SE2d 822) (1990). To allow a defendant's choice of when to make his opening statement to remain within the discretion of the trial court would render the option meaningless and would not encourage adherence to the Uniform Rules. Therefore, we now hold that it is error for a trial court to refuse to honor defense counsel's choice of when to make an opening statement as provided in Rule 10.2. To the extent that *Berryhill v. State*, supra, and the following cases hold otherwise, they are overruled: *McKenzie v. State*, 248 Ga. 294, 297 (11) (282 SE2d 95) (1981); *McArthur v. State*, 169 Ga. App. 263, 264 (2) (d) (312 SE2d 358) (1983); *Mims v. State*, 159 Ga. App. 712, 712 (1) (285 SE2d 67) (1981). Accordingly, the trial court erred in denying O'Kelley's request to make an opening statement in the sentencing phase.

O'Kelley contends that he was harmed by the trial court's error, because the presentation of his mitigation defense spanned four days

and consisted of the testimony of 22 witnesses and over 800 pages of documentary evidence. However, our review of the record shows that, despite the number of witnesses O'Kelley called, the volume of exhibits he tendered, and the duration of his presentation at the sentencing phase, O'Kelley's defense was a straightforward mitigation theory focusing on issues of mental illness and childhood abuse and neglect. As such, it was neither unusual nor complex.

Furthermore, O'Kelley's proposed opening statement submitted at his motion for new trial contained a single paragraph actually addressing the evidence to be presented. That paragraph simply stated that the defense "w[ould] attempt to present [O'Kelley]'s life to [the jury] in 3 volumes, each containing separate chapters[,]" with a social worker who would testify for the defense acting as a narrator and "provid[ing] a context to a period of time [the jury] w[ould] hear about[,]" and that the jury would also "hear from social workers, psychiatrists, psychologists, therapists, special education teachers, lawyers, police officers and others." The referenced social worker, who had prepared a psycho-social history of O'Kelley, appeared as the defense's first witness and presented a logical, comprehensive outline of O'Kelley's mitigating evidence and testified in chronological detail regarding the first phase of his life. The remainder of O'Kelley's evidence was presented in an orderly, easy-to-follow format.

In addition, the trial court informed the jury at the beginning of the sentencing phase of its purpose and charged the jury on the consideration of mitigating evidence, and, in an extensive closing argument, defense counsel thoroughly summarized the mitigating evidence and integrated it into O'Kelley's mitigation theory. Therefore, we conclude that it is highly improbable that the trial court's error contributed to the jury's verdict as to penalty and, thus, we find that the error was harmless. *Johnson v. State*, 238 Ga. 59, 61 (230 SE2d 869) (1976).

4. O'Kelley contends that lethal injection as it is performed pursuant to Georgia's current three-drug protocol violates the prohibition against cruel and unusual punishment contained in Article I, Section I, Paragraph VII of the Georgia Constitution and in the Eighth and Fourteenth Amendments to the United States Constitution. See *Louisiana ex rel. Francis v. Resweber*, 329 U. S. 459, 463 (67 SC 374, 91 LE 422) (1947) (stating that the Eighth Amendment is applied to the states through the Fourteenth Amendment's due process clause). The trial court conducted hearings on the procedures employed by the State of Georgia while carrying out an execution by lethal injection and also considered evidence from two previous death penalty cases, which served as the bases for previous challenges to lethal injection that this Court has rejected. See

*Williams v. State,* 281 Ga. 87, 90 (3) (635 SE2d 146) (2006); *Nance v. State,* 280 Ga. 125, 127 (4) (623 SE2d 470) (2005). The additional evidence submitted by O'Kelley does not warrant a different determination. Furthermore, having reviewed the record in light of *Baze v. Rees,* ___ U. S. ___ (128 SC 1520, 170 LE2d 420) (2008), we conclude that O'Kelley failed to meet the standard as enunciated by the United States Supreme Court for finding a state's lethal injection procedures cruel and unusual, in that he has not demonstrated that Georgia's procedures create " 'a substantial risk of serious harm.' " *Baze v. Rees,* supra at 1531 (II) (B) (plurality opinion) (citing *Farmer v. Brennan,* 511 U. S. 825, 842, 846, fn. 9 (114 SC 1970, 128 LE2d 811) (1994)). Accordingly, we reject O'Kelley's argument.

5. The death sentences in this case were not imposed under the influence of passion, prejudice, or any other arbitrary factor. OCGA § 17-10-35 (c) (1).

6. Viewed in the light most favorable to the State, the evidence was clearly sufficient to authorize the jury to find beyond a reasonable doubt the existence of the statutory aggravating circumstances. *Jackson v. Virginia,* supra; OCGA § 17-10-35 (c) (2).

7. Considering the crimes and the defendant, we find the sentences of death are not excessive or disproportionate to the penalty imposed in similar cases. OCGA § 17-10-35 (c) (3). According to O'Kelley's statement to police, while "[c]omplete[ly] sober," he and Stinski turned off the power to the Pittmans' house and broke into the home sometime after midnight, where, by the light of a flashlight, O'Kelley beat his own neighbor with a cane as she lay asleep in bed while her young daughter, guarded by Stinski, listened, terrified, in the next room. When "[Ms. Pittman] wouldn't die," O'Kelley sent Stinski outside with Kimberly to turn the power back on so he could see to kill her. O'Kelley admitted "stabb[ing] Ms. Pittman repeatedly with a knife retrieved from the Pittmans' kitchen, cut[ting] at her [as s]he tried to fight back . . . [and as she] ask[ed him], 'Why? Why?' " O'Kelley told the police that there was "[a] lot of stabbing, cutting, hitting, and fighting for about an hour" before he finally slit Ms. Pittman's throat to make her die. After O'Kelley had murdered her mother, Stinski took Kimberly upstairs and tied her up, and O'Kelley "sat there on the bed and . . . smoked one of" Ms. Pittman's cigarettes before washing the blood off himself in the bathroom. Then he drank a ginger ale he found in the kitchen to calm his nausea and went "around the house collecting stuff, throwing stuff in the bags." Eventually deciding to kill Kimberly together, O'Kelley and Stinski beat her in the head with a baseball bat, stabbed her repeatedly, threw bricks at her, and slit her throat as the child, clad only in a shirt, kneeled helplessly on her knees. Finally, knowing that "[Kimberly] was still alive and breath-

ing when [they] left the room" but that "[s]he was just unable to move[,]" O'Kelley helped set the Pittman residence on fire, leaving her to burn alive. The evidence at trial showed that O'Kelley bragged about his crimes to a friend, claiming to have raped Kimberly, calling it "special" and "just for him," and showing off like a trophy the tooth he knocked out of Kimberly's mouth. The evidence further showed that, after his arrest and incarceration, O'Kelley boastfully detailed in a twenty-four page letter to a fellow inmate his part in Kimberly's torture and murder. The cases listed in the Appendix support the imposition of the death penalty in this case in that all involve multiple murders, a deliberate murder during a burglary or first-degree arson, the murder of children, or the section (b) (7) statutory aggravating circumstance.

*Judgments of conviction affirmed in part and reversed in part with direction and death sentences affirmed. All the Justices concur.*

APPENDIX.

*Rivera v. State,* 282 Ga. 355 (647 SE2d 70) (2007); *Riley v. State,* 278 Ga. 677 (604 SE2d 488) (2004); *Franks v. State,* 278 Ga. 246 (599 SE2d 134) (2004); *Sealey v. State,* 277 Ga. 617 (593 SE2d 335) (2004); *Lewis v. State,* 277 Ga. 534 (592 SE2d 405) (2004); *Sallie v. State,* 276 Ga. 506 (578 SE2d 444) (2003); *Lance v. State,* 275 Ga. 11 (560 SE2d 663) (2002); *Lucas v. State,* 274 Ga. 640 (555 SE2d 440) (2001); *Rhode v. State,* 274 Ga. 377 (552 SE2d 855) (2001); *Presnell v. State,* 274 Ga. 246 (551 SE2d 723) (2001); *Fults v. State,* 274 Ga. 82 (548 SE2d 315) (2001); *Pruitt v. State,* 270 Ga. 745 (514 SE2d 639) (1999); *DeYoung v. State,* 268 Ga. 780 (493 SE2d 157) (1997); *Raulerson v. State,* 268 Ga. 623 (491 SE2d 791) (1997); *McMichen v. State,* 265 Ga. 598 (458 SE2d 833) (1995).

DECIDED NOVEMBER 3, 2008 —
RECONSIDERATION DENIED DECEMBER 16, 2008.

*Michael L. Edwards, Zipperer, Lorberbaum & Beauvais, Steven Beauvais, Brian L. Daly,* for appellant.

*Spencer Lawton, Jr., District Attorney, Gregory M. McConnell, David T. Lock, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Kristin S. White, Assistant Attorney General,* for appellee.