## S12P1309. RICE v. THE STATE.
(733 SE2d 755)

BENHAM, Justice.

A jury convicted Lawrence Rice of murdering Connie Mincher and her 14-year-old son, Ethan Mincher, and of burglary.[1] The jury found multiple statutory aggravating circumstances related to each of the murders and recommended a death sentence for each of the murders, which the trial court imposed. For the reasons set forth below, we affirm.

1. Viewed in the light most favorable to the State, the evidence presented at trial showed the following. Lawrence Rice met Trevor Mincher in or around 1990, when Rice began working at a video

---

[1] Rice committed the crimes on April 17, 2003. He was indicted by a Cobb County grand jury on two counts of malice murder, two counts of felony murder, and one count of burglary in an indictment that was signed by the grand jury foreperson on October 23, 2003, and was filed on October 24, 2003. The State filed a written notice of its intent to seek the death penalty on October 24, 2003. This Court considered several pre-trial issues on interim review. See *Rice v. State*, 281 Ga. 149 (635 SE2d 707) (2006). After the trial court initially ordered a competency evaluation over Rice's objection, Rice later entered a special plea of incompetence on May 28, 2008. On June 13, 2008, a jury found Rice competent to stand trial. Jury selection for Rice's criminal trial began on June 17, 2008. The jury convicted Rice on all five counts on July 14, 2008, and it recommended a death sentence for each of the murders on July 16, 2008. Later on July 16, 2008, the trial court imposed death sentences for each malice murder count in accordance with the jury's sentencing verdict and properly treated the two felony murder counts as mere surplusage. See *Malcolm v. State*, 263 Ga. 369 (4) (434 SE2d 479) (1993); OCGA § 16-1-7 (a) (providing for the proper disposition where the same conduct establishes more than one crime); OCGA § 17-10-31 (a) ("Where a statutory aggravating circumstance is found and a recommendation of death is made, the court shall sentence the accused to death."). Rice filed a motion for a new trial on July 24, 2008, which he amended on November 18, 2010. The trial court conducted a hearing on the amended motion for a new trial on November 22, 2010, and it denied that motion on April 27, 2011. Rice filed a timely notice of appeal on May 24, 2011, and amended that notice on May 25, 2011. This appeal was docketed to the April 2012 term of this Court, and the case was orally argued on September 10, 2012.

production company under Mr. Mincher's supervision. Shortly afterward, another man was hired at the company, and Rice resigned in anger after he came to believe that this other man was being paid more than he was. After resigning, Rice began a 13-year course of harassing Mr. Mincher and his wife, beginning with his standing around at a convenience store near Mr. Mincher's work and then repeatedly making unwanted telephone calls. Rice also was the likely source of a Christmas card sent to Mr. Mincher that had been altered to depict an angel with a blackened eye and blood dripping from its wings, that contained feathers and Carribean coins, and that stated that the "curse of Akbar" had been placed on Mr. Mincher and his family. Rice's motive and plan for the crimes were most clearly demonstrated in a lengthy manuscript that he had written, titled "Culture Shock," in which he detailed his belief that Mr. Mincher had been speaking ill of him within the video production industry and thus preventing him from finding employment, his evolving financial difficulties, and his plan to murder Mr. Mincher's family with a hatchet if his situation did not improve.

In the days leading up to the murders, several witnesses observed Rice in the Minchers' neighborhood sitting in his damaged gold Mercedes and walking around. On the day of the murders, April 17, 2003, several neighbors and a school bus driver described seeing Rice's automobile parked in the Minchers' driveway around the time of the murders, Rice getting something out of the trunk of his automobile and going into the Minchers' house, Ethan Mincher arriving from school and entering the house, and Rice leaving the house hurriedly in his automobile. Trevor and Connie Mincher's daughter arrived home from school shortly after Rice was seen fleeing the scene. She observed an automobile-sized dry spot on the driveway, which, because there was drizzling rain that day, showed that Rice had only recently departed. Inside the house, Connie Mincher was lying face down on a bed with a rug over her head and was already dead. Ethan Mincher was lying face down in a large pool of blood in the kitchen, but he was still alive. Ethan Mincher died shortly afterward.

When investigators told Mr. Mincher about the gold Mercedes that had been seen at the Minchers' house, Mr. Mincher told them about Rice. Investigators met up with Rice, and he admitted that he had been at the Minchers' house around the time of the murders. However, Rice claimed that he had been at the Minchers' house to receive money from Connie Mincher, that he had gone into the house when Ethan Mincher arrived, that a man named "Jason" had arrived later, and that he had left because "Jason" was not "cordial" to him. Contrary to Rice's account, a number of witnesses testified at trial

that the Minchers had never mentioned anything about lending money to Rice or anything about someone named "Jason." A search of Rice's automobile revealed a map with the Minchers' neighborhood circled and a handgun containing one bullet. Mr. Mincher's video-recorded deposition testimony, which was seen by the jury, confirmed other evidence of Rice's motive, Rice's history of harassing and threatening Mr. Mincher and his wife, and the fact that the Minchers did not know someone named "Jason."

A paramedic testified that Ethan Mincher had duct tape over his mouth and in his hair when unsuccessful medical treatment on him was begun, and the medical examiner testified that Connie Mincher had duct tape over her mouth and around her head and neck. The medical examiner further testified as follows. Connie Mincher's hands had been bound behind her back, and Ethan Mincher had a set of handcuffs attached to one of his wrists. Connie Mincher had a black eye, a bruise on her upper back, fractured ribs, and petechial hemorrhages in her eyes indicative of her having been asphyxiated by the duct tape that was wrapped around her neck. She had suffered at least five and perhaps eleven or more blows to her head with an instrument or instruments consistent with the sharp and blunt ends of a hatchet, and her skull was fractured and depressed into her brain. Ethan Mincher's body showed signs of having been in a struggle, including bruises to his eye, cheek, lips, chin, scalp, and upper chest and abrasions to his arm and neck. Ethan Mincher's most serious wounds, like Connie Mincher's, were consistent with the murder weapon's having been a hatchet. He had suffered at least two blunt force blows to his back, which broke his ribs and left a rectangular abrasion. He had also suffered multiple blunt force blows to his skull, which was fractured and depressed into his brain.

Upon our review of the record, we conclude that the evidence presented at trial was sufficient to authorize a rational trier of fact to find Rice guilty beyond a reasonable doubt on all counts. See *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). See also Unified Appeal Procedure IV (B) (2) (providing that, in all death penalty cases, this Court will determine whether the verdicts are supported by the evidence).

*Competency Trial Issues*

2. Because it had concerns about Rice's mental state, the trial court ordered a jury trial on the question of Rice's competence to stand trial. Later, Rice entered a special plea of incompetence. See OCGA § 17-7-130 (b). We find no merit to Rice's claims that his competency trial was defective.

(a) Prior to the competency trial, defense counsel filed a pleading in which counsel objected to the trial court's conducting a competency trial and in which counsel argued that Rice had shown no signs of incompetence. Rice argues on appeal that the trial court erred by overruling his motion in limine concerning the State's intent to use the pleading as evidence at the competency trial. The trial court was correct in ruling that the pleading was admissible as a statement in judicio. See OCGA § 24-3-30 ("Without offering the same in evidence, either party may avail himself of allegations or admissions made in the pleadings of the other."). Because we conclude that the pleading was admissible, we need not address the extent to which Rice might have waived his objection to the State's use of the pleading when, after the State had questioned the defense expert about the contents of the pleading and testimony favorable to Rice was given by the expert in response, Rice stated that he had no objection to the introduction of the written pleading itself.

(b) Rice was evaluated by a court-appointed expert, who found him to be competent at the time of the evaluation. After this court-appointed expert left his employment with the Department of Human Resources and entered private practice, the trial court denied Rice's request for funds to hire him as a defense expert for further evaluation of Rice because of the trial court's concern about a conflict of interest. However, the trial court authorized funds for a new expert to serve as a defense expert. This new expert found Rice to be incompetent, because she found that Rice's paranoia interfered with his ability to assist his attorneys. Rice argues that the trial court erred by allowing the State to argue that the defense had chosen to hire this new expert because the defense wanted a psychiatric evaluation different from the last one. However, Rice has failed to cite to anywhere in the record where he objected to this statement or the State's argument concerning the statement, which appears to have been elicited first from the defense expert under direct examination by Rice and which appears to have been fully explained through additional questioning about how the defense expert had been hired. Thus, this issue, which could not have affected the trial jury's selection of a death sentence later in Rice's criminal trial, is waived. See *Gissendaner v. State*, 272 Ga. 704 (10) (b) (532 SE2d 677) (2000) (setting forth the waiver rule applied in death penalty cases).

*Jury Selection Issues*

3. Rice argues that the trial court erred by refusing to excuse certain jurors. Because a defendant is entitled to a full panel of

qualified jurors at the beginning of peremptory strikes, "the errone-ous qualifying of a single juror for the panel from which the jury was struck" would require reversal. *Lance v. State*, 275 Ga. 11, 15 (8) (560 SE2d 663) (2002). A juror who favors the death penalty must be excused for cause if those views "would prevent or substantially impair the performance of the juror's duties as a juror in accordance with the instructions given the juror and the oath taken by the juror." Id. (citing *Greene v. State*, 268 Ga. 47, 48 (485 SE2d 741) (1997)). We also apply this same standard where a juror is challenged based on his or her willingness to consider life with the possibility of parole and life without the possibility of parole. See id. at 16. In reviewing challenges to jurors based on their views on sentencing, we give deference to the trial court's findings. See id. at 15-16. We also give deference to a trial court's determination of whether a juror is biased on grounds unrelated to their views on sentencing. See *Ledford v. State*, 289 Ga. 70 (8) (709 SE2d 239) (2011) (addressing the trial court's rulings regarding multiple sources of potential bias). We apply these standards below, and we find no error.

(a) Juror Spiceland stated that her concerns about forfeited hourly wages "would be on [her] mind" if she were selected to serve as a juror, but she also stated that she nevertheless would be "able to focus and give full consideration" of the case. The trial court noted that Juror Spiceland would not suffer extreme hardship, because her food and accommodations would be provided by the Court during the trial and because she would receive some financial compensation as a juror. We do not find an abuse of discretion in the trial court's refusal to excuse her.

(b) Rice argues that Juror Dixon should have been deemed automatically disqualified because his sister had been the victim of a crime, the perpetrator had been released on parole after serving 12 years of what Juror Dixon believed was a sentence of life without the possibility of parole, his sister feared for her future safety, and Juror Dixon was frustrated with the outcome of the case. We disagree that such an automatic disqualification should apply, and we find no abuse of the trial court's discretion in finding Juror Dixon qualified to serve in light of his voir dire as a whole, particularly his clear responses indicating that he had no predisposition about Rice's case and that he would consider all three possible sentences.

(c) Juror Beck stated that, based on what she had learned about the allegations against Rice when the trial judge read the indictment, she would lean against a sentence of life with the possibility of parole if Rice were found guilty. However, she clearly stated that she would consider that sentencing option in light of any mitigating evidence

and would be able to vote for it. The trial court did not abuse its discretion by refusing to excuse her.

(d) Rice argues that Juror Urquart should have been disqualified based on his views about "mercy." Our review of Mr. Urquart's voir dire reveals that he repeatedly and emphatically stated that he would consider all mitigating evidence with an "open mind" and that he would be able to impose a life sentence. Defense counsel asked, "Could you consider mercy as mitigation?" Mr. Urquart answered, "Depending on the mitigating circumstances." Defense counsel then stated that mitigation could include things like a bad childhood but could also "be nothing short of just yourself having mercy." Defense counsel then asked, "Would you consider mercy in the case if you're in that position I put you in?" Mr. Urquart answered, "I don't believe so, in good conscience." The question asked by defense counsel sought an answer about whether the juror would consider granting mercy even in the absence of any mitigating evidence, which was an improper question. See *Sallie v. State*, 276 Ga. 506 (3) (578 SE2d 444) (2003) (holding the following question to have been improper: " 'If the jury finds beyond a reasonable doubt the defendant is guilty of murder and further finds beyond a reasonable doubt that statutory aggravating circumstances exist, or a statutory aggravating circumstance exists, and further find[s] no mitigating circumstances exist, could you nevertheless consider mercy?' "). A juror must consider mercy *in light of* mitigating factors that might exist in the case, including simply the weaknesses of the State's own evidence. However, we are aware of no authority, and Rice cites none, for the proposition that a juror must consider mercy despite the absence of any mitigating factors upon which to base such mercy. See OCGA § 17-10-2 (c) (providing that "the jury shall retire to determine whether any mitigating or aggravating circumstances, as defined in Code Section 17-10-30, exist and whether to recommend mercy"). See also *Commonwealth v. Powell*, 956 A2d 406, 427 (Pa. 2008) ("Of course, a jury may consider mercy or sympathy when weighing specific aggravating and mitigating factors, but it may not exercise its sense of mercy or sympathy in a vacuum."). We find no abuse of discretion in the trial court's refusal to excuse Juror Urquart.

(e) Even under arguably improper questioning by Rice seeking prejudgment on sentencing under a given set of limited hypothetical circumstances that often omitted any reference to possible mitigating factors, Jurors Kirk, Peacock, and Shuman insisted that they would consider all three sentences in light of all of the evidence. The trial court did not abuse its discretion by refusing to excuse them. See *Nance v. State*, 280 Ga. 125 (6) (623 SE2d 470) (2005) (holding that the trial court "properly sustained" an objection to "a question that listed

the specific circumstances of [the defendant's] case and then inquired of the prospective juror whether she could vote for a life sentence under those circumstances"); *Gissendaner*, 272 Ga. at 707-708 (holding that defense counsel was "properly admonished" for asking a question about "a particular species of malice murder, namely malice murder where significant premeditation has occurred"); *Pace v. State*, 271 Ga. 829 (7) (524 SE2d 490) (1999) (holding that "[a] prospective juror is not subject to excusal for cause for merely leaning for or against a death sentence").

(f) As with the jurors discussed immediately above, Juror Gillmore's responses, often given in response to arguably improper questions by Rice, showed that he would consider all three sentences in light of all of the evidence. Id. Juror Gillmore also stated that he had seen an online news article about the crimes approximately five years in the past. However, Juror Gillmore made clear that he had only a limited recollection of the details of the article, that he did not believe that it was necessarily accurate, and that he would base his deliberations solely upon the evidence presented at trial. See *Lawler v. State*, 276 Ga. 229 (5) (576 SE2d 841) (2003) (addressing jurors' exposure to pre-trial news reports). Furthermore, the issue of Juror Gillmore's prior exposure to news coverage of the case is waived as a matter of alleged trial court error, because Rice's motion to excuse the juror made no mention of that issue. See *Gissendaner*, 272 Ga. at 713-714 (setting forth the waiver rule applied in death penalty cases). We find no abuse of discretion in the trial court's refusing to excuse this juror.

(g) Rice argues that Juror Robertson should have been disqualified based upon his responses regarding the futility of housing someone in prison without parole. Trial counsel's motion to excuse this juror on this ground did not include this particular argument and, therefore, it is waived as a matter of alleged trial court error. Id. Furthermore, we note that Juror Robertson was not unqualified to serve, because he made clear, both before and after these particular comments, that he would consider all three possible sentencing options and because he indicated specifically that his views about long terms of imprisonment would not prevent him from considering life without the possibility of parole as a sentencing option.

(h) Rice complains that Juror Holley stated at one point in his voir dire that he, quite understandably, found it "upsetting to see an innocent person become a victim of a heinous crime." However, both before and after making this comment, the juror clearly indicated that he would consider all of the evidence and all three sentencing options. Even assuming that Rice's motion to excuse this juror encompassed the particular aspect of his voir dire that Rice addresses

on appeal and, thus, that Rice's claim here has been preserved for appeal, we find no abuse in the trial court's refusing to excuse this juror.

(i) Juror Vantreese stated that he would consider all of the evidence and all three sentencing options in a murder case. He then further stated that, even upon a conviction for double murder as charged in Rice's indictment, he would consider all three sentencing options, although life with the possibility of parole "would be a stretch" and would seem warranted only if there were "very heavy mitigating" evidence. Only after Rice engaged in improper questioning that posited the hypothetical circumstance where the State had shown strong aggravating evidence and the hypothetical circumstance where there were no mitigating circumstances did Juror Vantreese state that he would ever rule out life with the possibility of parole. Furthermore, even after this improper questioning, the juror stated that, even under such extreme circumstances, he would still consider all three sentences and could impose a sentence of life with the possibility of parole under "unbelievably mitigating" circumstances. We find no abuse of the trial court's discretion in finding this juror qualified to serve.

(j) Throughout his initial voir dire, Juror Caylor stated repeatedly that he would consider all of the evidence and all three sentencing options. When questioned by Rice about why he favored the death penalty as a general matter, Juror Caylor stated that it was from his religious views, and when further asked by Rice to state "the best reasons [he could] think of for society to have the death penalty," he responded that someone put to death "won't kill again." In his further voir dire, Juror Caylor's responses further confirmed his ability to consider and vote for all three possible sentences. We find no abuse of the trial court's discretion in refusing to excuse him.

(k) Our review of the record reveals that Juror Fincannon was among the jurors from which the alternate jurors were selected. Because no alternates participated in deliberations in Rice's case, we need not address whether the trial court erred by refusing to excuse this juror. See *O'Kelley v. State*, 284 Ga. 758 (2) (c) (670 SE2d 388) (2008); *Pope v. State*, 256 Ga. 195 (7) (e) (345 SE2d 831) (1986) ("Any error regarding a prospective juror qualified 43rd or later on the panel is harmless, unless it becomes necessary to use an alternate juror."), overruled on other grounds by *Nash v. State*, 271 Ga. 281, 281 (519 SE2d 893) (1999).

(l) Similarly, we need not address whether the trial court erred by refusing to excuse Juror Caswell, because our review of the record reveals that he was not among the jurors from which the original jurors or the alternate jurors were selected. Id.

4. Rice argues that the trial court erred by excusing a number of jurors for cause based on their responses on various topics, including the jurors' willingness to consider each of the three sentencing options. The standard applied to whether a juror has been properly excused based on the juror's unwillingness to consider any of the three possible sentences is whether the juror's views "would prevent or substantially impair the performance of the juror's duties as a juror in accordance with the instructions given the juror and the oath taken by the juror," and the trial court's findings on the matter are afforded deference on appeal. *Lance*, 275 Ga. at 15-16 (citing *Greene*, 268 Ga. at 48). We also give deference to a trial court's determination that a juror is not biased regarding matters unrelated to the juror's views on sentencing. See *Ledford*, 289 Ga. at 80-81.

(a) Juror Scharnhorst stated that he was conscientiously opposed to the death penalty, that he would vote against it regardless of the circumstances of the case, and that there were no circumstances under which he could vote for it. The trial court plainly did not abuse its discretion in excusing this juror.

(b) Juror Lacayo stated that he was conscientiously opposed to the death penalty and that, based on his religious faith and his employment as a doctor, he would automatically vote against the death penalty in all cases. Even assuming that Rice made a proper objection to having the juror excused based on his voir dire responses, we find no abuse of discretion by the trial judge in doing so.

(c) Juror Christoff stated that she was conscientiously opposed to the death penalty for religious reasons and that she did not think that there were any circumstances under which she would vote to impose it. Even assuming that an objection based on her voir dire responses was properly raised, we find that the trial court did not abuse its discretion in excusing her.

(d) Juror Melton stated that she was conscientiously opposed to the death penalty, that she would automatically vote against it, that she did not believe there were any circumstances under which she would vote for it, and that she would give the death penalty no consideration. Rice argues that she was qualified to serve, despite these clear responses, simply because she indicated that she would listen to the other jurors' views before inevitably voting against a death sentence herself. The trial court properly excused this juror. See *Nance v. State*, 272 Ga. 217 (6) (526 SE2d 560) (2000) (reversing where a prospective juror stated that she would listen to the evidence but would inevitably exclude a sentencing option).

(e) Juror Relford stated that she was conscientiously opposed to the death penalty and could not vote to impose it. She then gave some seemingly contradictory responses during the remainder of her voir

dire but eventually explained that her varying responses were due to her uncertainty about whether the law should allow for death sentences but that she was certain that she could not vote as a juror to impose a death sentence. The trial court, in light of Juror Relford's voir dire as a whole, did not abuse its discretion in excusing her.

(f) Juror Summerour, who was 80 years old, gave a number of responses to questions that clearly revealed that he was having difficulty hearing or understanding portions of his voir dire. We do not find that the trial court abused its discretion in excusing him.

(g) Juror Taing stated that his first language was Cambodian, that he had difficulty understanding English, that he had brought a translation dictionary to assist himself in understanding the proceedings, that he did not know which person in the courtroom was the defendant, and that he was concerned that he might make the wrong decisions as a juror because of his inability to understand the trial proceedings. The trial court at first found that Juror Taing had an adequate understanding of the proceedings. However, after additional voir dire in which Juror Taing repeatedly seemed to misunderstand questions and in which he stated that he was understanding only 50 or 60 percent of what was being said, the trial court excused him. We find no abuse of the trial court's discretion.

(h) Jurors Jenkins, Weinberg-Benson, Smith, Hartwell, Bickerstaff, and Reid stated that they were conscientiously opposed to the death penalty on moral, religious, or other grounds and that they did not believe that they could ever vote to impose it. The trial court did not abuse its discretion by excusing these jurors.

(i) Juror Cato's initial statements in his voir dire suggested that he might be willing to consider a death sentence as a possible sentencing option, but his voir dire as a whole indicated that, based on his religious convictions, he did not believe that he would be capable of considering a death sentence and that the only instance in which he might reconsider that conviction would be if his own family member were the victim of a murder. See *King v. State*, 273 Ga. 258 (19) (b) (539 SE2d 783) (2000) (addressing a juror who would only consider the death penalty in a case involving his own close family member). We find no abuse of discretion in the trial court's excusing him.

(j) Juror Hua gave somewhat conflicting and confusing responses at various points during his voir dire by the trial court. He stated that he was conscientiously opposed to the death penalty. He then indicated that he was not automatically opposed to it in extreme cases "like . . . Jeffrey Dahmer or something," but he then immediately made a confusing statement about the roles of repentance from sin and forgiveness. Finally, when asked by the trial court if he could

"realistically ever vote to impose the death penalty on another person," he answered, "I would say no." During his voir dire by Rice, Juror Hua gave contradictory responses, repeating that he would not be able to vote for the death penalty, suggesting that the death penalty might be acceptable, and arguably suggesting that he could vote for the death penalty under extreme circumstances. Finally, during his voir dire by the State, Juror Hua gave a confusing response that at least arguably indicated that he believed that the death penalty might sometimes be acceptable but that he personally did not approve of it because it foreclosed the possibility of second chances, and he then indicated that he believed that his views would harm his ability to consider death as a possible sentencing option. In light of the totality of Juror Hua's voir dire, we find no abuse of discretion in the trial court's excusing him. See *Nance*, 272 Ga. at 222 (holding that this Court's deference to the trial court "includes the trial court's resolution of any equivocations or conflicts in the prospective juror's responses" and that "the relevant inquiry is whether the trial court's qualification of the prospective juror is supported by the record as a whole").

(k) Under questioning by the trial court, Juror Gondron initially gave somewhat equivocal responses suggesting that he was conscientiously opposed to the death penalty "most of the time," that he might be able to consider it if his own children were involved, that "he would have a very hard time being responsible for someone's death," and that, although he did not yet know the facts of the case, he thought he probably could not vote for the death penalty. Under questioning by Rice, Juror Gondron indicated that he did not know if he could consider all three sentencing options. When asked by the State if he personally could vote to impose a death sentence, Juror Gondron indicated that he could not. Finally, when asked whether he could vote for a death sentence if he "felt it was appropriate," he indicated that he could not answer because he did not know yet. In light of Juror Gondron's voir dire as a whole, we find no abuse of the trial court's discretion in excusing him.

(l) Juror Pezold initially stated that she was uncertain whether she could vote to impose a death sentence and that she would have to consider the circumstances of the case before she could answer whether she would always and automatically vote against it. However, she later stated that she could not envision any circumstances under which she could vote for it. She further explained that she had never thought through the issue, that her views were evolving, that she would not know whether she would be capable of *voting* for a death sentence under any circumstances until she was already involved in a trial, but that she could participate in deliberations and

*consider* all three sentences. A juror such as this one, who is willing to "listen to the law and the facts and choose the appropriate sentence" but who is substantially impaired, at the outset of the trial, in his or her ability to ever actually *vote to impose* one of the possible sentences is not qualified to serve. See *Nance*, 272 Ga. at 223 (reversing where a prospective juror stated that she would always conclude that a death sentence would be the appropriate sentence for a murder). In light of Juror Pezold's voir dire as a whole, we find no abuse of the trial court's discretion in excusing her. See id. at 222.

## Guilt/Innocence Phase Issues

5. Rice argues that the trial court erred in the guilt/innocence phase by admitting the pre-trial deposition of Trevor Mincher, who was the husband of Connie Mincher and the father of Ethan Mincher and who died after the State's direct examination but before the date to which the defense implicitly consented for a delayed cross-examination. To the extent that Rice's arguments address the issues of his waiver of his right to the confrontation of witnesses, the statutory authority of the trial court under OCGA § 24-10-130 to order that the deposition would begin immediately, and the constitutional sufficiency of the notice of when a deposition of Trevor Mincher might occur, those arguments are barred under the law of the case by our decision on interim review. See *Rice v. State*, 281 Ga. 149 (2) (635 SE2d 707) (2006) (addressing the admissibility of Trevor Mincher's deposition on interim review). See also *Foster v. State*, 290 Ga. 599 (3) (723 SE2d 663) (2012) (addressing the law of the case rule in a criminal case). Rice's new arguments based on the alleged violation by the State of other specific requirements contained within OCGA § 24-10-130 et seq., based on an alleged violation of the Georgia Constitution, and based on the right to cross-examination under OCGA § 24-9-64 were not preserved by objection below, and they are therefore waived as matters of alleged trial court error. See *Gissendaner*, 272 Ga. at 713-714 (setting forth the waiver rule applied in death penalty cases).

## Sentencing Phase Issues

6. Rice argues that the trial court erred by refusing to grant his motion for a continuance of the sentencing phase of his criminal trial. We disagree.

Our review of the record, including the transcripts of the ex parte hearings, reveals that defense counsel were aware early in their pre-trial preparations, through their review of Rice's "Culture Shock"

manuscript, of the possible existence of a doctor or psychologist named Dr. Jean Cardin and of the fact that Dr. Cardin might have treated Rice for depression almost 13 years prior to the murders and almost 18 years prior to Rice's trial. The record also reveals, however, that trial counsel's efforts to locate this practitioner on a timely basis were frustrated by Rice's refusal to assist them. At the beginning of Rice's competency trial, which was about a month before Rice's criminal trial, defense counsel informed the trial court ex parte that they had located "a Dr. Cardin" in St. Simons who was a "family practitioner" who had diagnosed Rice for depression years earlier. The trial court agreed to sign an ex parte order to allow defense counsel to obtain any records that this Dr. Cardin might have regarding Rice, and such an order was actually filed ex parte just over two weeks before Rice filed the motion for a continuance of his *criminal* trial that is at issue in this appeal. In open court, however, the trial court denied defense counsel's motion for a continuance of the *competency* trial, stating that, although the facts at issue might be new to defense counsel, Rice himself had had personal knowledge of them for a long time. The denial of the motion for a continuance of Rice's competency trial is not at issue in this appeal, but we have recited the facts surrounding it because they are relevant to his later motion for a continuance at his criminal trial.

On the day that the sentencing phase of Rice's criminal trial was to begin, with the jury already sequestered, defense counsel announced to the trial court that they had finally succeeded in locating Dr. Cardin but that she was on vacation in South Carolina with her daughter for four more days. Defense counsel requested a continuance of three days. Defense counsel also explained that they had been unable to locate Dr. Cardin more quickly during the preceding weeks because she had been out of the country. The trial court offered funds for Dr. Cardin and her daughter to fly to and from Georgia on the same day so that she could testify and advised defense counsel to contact Dr. Cardin by telephone immediately, but the trial court denied Rice's request for a continuance. Defense counsel made no proffer at Rice's criminal trial of what Dr. Cardin's testimony might have been beyond stating that she could testify about Rice's mental condition many years in the past when she treated him, could testify about the fact that she and he were friends, and could testify about "some things as part of the mitigating circumstances as well." Our review of the record reveals that defense counsel never raised the subject again after they were offered funds to bring Dr. Cardin to trial.

Under these circumstances, particularly in light of the trial court's prior knowledge that Dr. Cardin very likely had not been

contacted much earlier simply because Rice refused to assist his counsel in doing so and in light of the availability of expert witnesses who had examined Rice much more recently than Dr. Cardin, we conclude that the trial court did not abuse its discretion in denying the motion for a continuance and that Rice has failed to show that he was harmed. See *Loyd v. State*, 288 Ga. 481 (3) (705 SE2d 616) (2011).

7. Contrary to Rice's argument, the trial court's charge on mitigating circumstances would not have misled any of the jurors to believe that they must unanimously agree on the existence of any given mitigating circumstance in order to cast a vote for a sentence less than death, because the charge made clear that the jury need not find *any* mitigating circumstances in order to consider a sentence less than death. See *Rhode v. State*, 274 Ga. 377 (15) (552 SE2d 855) (2001) (approving the pattern jury charges on the subject of mitigating circumstances).

8. Rice has failed to indicate anywhere in the record where he objected to the victim impact evidence that was presented at his trial. To the contrary, our review of the record suggests that Rice and the State worked together to edit the State's proposed victim impact statements. Accordingly, this issue is waived as a matter of alleged trial court error. See *Gissendaner*, 272 Ga. at 713-714 (setting forth the waiver rule applied in death penalty cases).

*Motion for New Trial Issues*

9. Rice claims that his trial counsel rendered ineffective assistance in his pre-trial and trial proceedings. This claim was properly litigated in the trial court as part of Rice's motion for a new trial, because Rice was represented by new attorneys at that stage. See *Glover v. State*, 266 Ga. 183 (2) (465 SE2d 659) (1996). To prevail, Rice must show that his trial counsel rendered constitutionally deficient performance and that actual prejudice of constitutional proportions resulted. *Strickland v. Washington*, 466 U. S. 668 (III) (104 SC 2052, 80 LE2d 674) (1984); *Smith v. Francis*, 253 Ga. 782 (1) (325 SE2d 362) (1985). To show sufficient prejudice, Rice must show that "there is a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's unprofessional errors, the result of the proceeding would have been different. [Cit.]" *Smith*, 253 Ga. at 783. We accept the trial court's findings of fact unless they are clearly erroneous, but we apply the law to the facts de novo. *Strickland*, 466 U. S. at 698; *Head v. Carr*, 273 Ga. 613 (4) (544 SE2d 409) (2001).

Upon our review of the record, we conclude that the trial court properly denied Rice's ineffective assistance of trial counsel claim,

because trial counsel performed reasonably in most respects and because any deficiencies that arguably existed in their performance did not in reasonable probability change the outcome of Rice's trial. See *Schofield v. Holsey*, 281 Ga. 809, 811-812, n. 1 (642 SE2d 56) (2007) (holding that the combined effect of trial counsel's deficiencies should be considered); *Lajara v. State*, 263 Ga. 438 (3) (435 SE2d 600) (1993) (noting that an ineffective assistance of counsel claim can be resolved based solely on a lack of prejudice without addressing the separate question of whether trial counsel performed deficiently).

(a) In several sub-parts of his ineffective assistance claim, Rice argues that trial counsel failed to perform an adequate investigation into his competency to stand trial, failed to perform an adequate mitigation investigation over Rice's own objection to such an investigation, and failed to develop a relationship of trust with Rice. We find these related arguments all to be without merit.

Our review of the record, including the ex parte portions, reveals that Rice was stubbornly uncooperative with a series of attorneys and was generally opposed to the preparation of mitigating evidence. Nevertheless, the series of attorneys who undertook to represent Rice went to great lengths to develop mitigating evidence in the hope that Rice would allow them to use it at trial, while simultaneously being careful not to alienate him but, instead, attempting to gain his trust and cooperation and persuading him that he should allow mitigation evidence at trial. See *Perkins v. Hall*, 288 Ga. 810 (II) (A) (708 SE2d 335) (2011) ("[R]easonable attorney performance includes investigating mitigating evidence to the extent feasible given the defendant's willingness to cooperate and then, if the defendant insists, following his instructions regarding the ultimate defense to pursue.").

Rice's refusal to cooperate with his counsel in preparing mitigating evidence was so complete that he initially refused to discuss his family or even to provide any of his family members' names. One of Rice's early lawyers testified as follows at one pre-trial hearing regarding Rice's refusal to communicate: "I represented him for a year and a half and don't know anything about his family, nothing." Faced with Rice's steadfast refusal to cooperate, despite the repeated substitution of counsel, counsel and the multiple investigators they employed were left with no option other than to begin their investigation based solely on the manuscript Rice had written, "Culture Shock," which contained not only years' worth of Rice's ranting over perceived slights by Trevor Mincher but which also contained hints about Rice's personal life. From this starting point, counsel coordinated a multi-state and multi-national effort to investigate Rice's background.

Trial counsel employed a number of persons to assist in their investigation at various times, including a private investigator, a mitigation specialist, and an expert on Afro-Carribean culture. Counsel made arrangements for an investigator or police officer in Rice's native country of Trinidad to spend one or two weeks seeking out any surviving family members and potential mitigating evidence in an effort to find information to use in seeking funds for a fuller investigation there. The record also shows that counsel had their investigators attempt to locate and contact any of Rice's surviving family members in the United States, having the investigators "walking pavements in New York City and Atlanta," contacting persons with the last name of Rice in Florida, waiting outside the assisted living home in Florida where they believed Rice's mother lived and was sometimes visited by Rice's brother, and seeking to make contact with other family members despite Rice's resistance and lack of cooperation. For example, trial counsel was not informed by Rice that he even *had* a sister until "a couple of weeks" prior to the beginning of the competency trial, and even then Rice refused to give counsel her name. Nevertheless, counsel informed the trial court that they had discovered a woman who *might* have been Rice's sister, informed the trial court that they had attempted to make contact with her by telephone, and requested funds to send an investigator to attempt to make contact with her. When counsel finally contacted the sister, she initially suggested that she might cooperate, but she later indicated that she and her brother would not cooperate with the defense and did not want to be contacted any further. Similarly, trial counsel learned that Rice had an ex-wife and a daughter, but Rice refused to assist counsel in contacting these women. The record shows that, when a defense investigator finally made contact with these women, they refused to have anything to do with Rice's case. Likewise, Rice's mother also sent word to a defense investigator through a caretaker that she wanted the defense investigator to leave. The record also shows that trial counsel had one of the investigators attempt to locate Rice's former employers and friends in New York, but with little success because of Rice's lack of cooperation. When Rice's personal telephone book was discovered, counsel had their investigators call every telephone number in it seeking possible mitigation evidence. When an investigator also discovered other personal items belonging to Rice in boxes that had been held by Rice's friend, counsel inspected those as well.

Rice faults his counsel for failing to obtain documents and records that might have been helpful as mitigating evidence. But the record is clear that Rice himself refused to cooperate in discovering what documents might exist and where they might be located. The

record also shows that, despite Rice's refusal to sign any releases for records, counsel were prepared to use orders from the trial court to obtain any records that they could determine were in existence.

The record also shows that trial counsel performed well in preparing mental health evidence despite Rice's resistance. One of Rice's early lawyers testified at Rice's competency trial as follows: "[M]y feeling was that if I had [tried to have him evaluated by an expert], that Mr. Rice would not have cooperated with it, so we would have been spinning our wheels." Indeed, when trial counsel finally did attempt to have Rice evaluated by a defense expert in preparation for the competency trial, Rice refused to participate. Nevertheless, trial counsel succeeded in obtaining favorable testimony from this expert at Rice's competency trial and at the criminal trial by providing her with documentary materials and a copy of the report prepared by the court-appointed expert to use in forming her own opinions. The record also shows that trial counsel worked with the court-appointed expert prior to Rice's competency trial and provided him with materials to assist in his evaluation of Rice, and that expert's testimony at the competency trial proved favorable enough to Rice that counsel chose to present it as part of the defense's case in the sentencing phase of Rice's criminal trial. Finally, although Rice presented new testimony in his motion for a new trial from a woman who claims to have known Rice for 15 years, he has failed to show how counsel could have discovered her testimony under the circumstances confronting his trial counsel.

Finally, although we conclude that trial counsel's performance regarding their pre-trial preparations of mental health and mitigating evidence was reasonable, we further note that Rice has almost completely failed to present any evidence of prejudice from trial counsel's alleged failure to do other things to prepare for trial. One exception, arguably, is the new testimony Rice has presented from his friend who claims to have known him for 15 years. However, even if we were to assume that counsel should have been able to locate this witness despite Rice's lack of cooperation, we find that her testimony would not have been significantly mitigating. To the contrary, we conclude as follows: the witness's description of Rice's kindness to children would have been cumulative of testimony from another friend who did testify at trial and would have been fairly unpersuasive in any case in light of the evidence that Rice had murdered a 14-year-old boy in cold blood; other aspects of the new testimony regarding Rice's suspiciousness, jealousy, paranoia, and depression would have been merely cumulative of the testimony presented at

trial, including the expert testimony; and aspects of the new testimony that Rice claims would have cast doubt on his guilt would have been entirely unpersuasive if presented at trial.

(b) Rice argues that trial counsel rendered ineffective assistance during the deposition of Trevor Mincher because they chose to accept the trial court's offer to delay their cross-examination for two weeks so that they could be better prepared. Implicit in our holding on interim review, in which we found that trial counsel had waived Rice's right to cross-examine Mr. Mincher on the day of the State's direct examination, is the notion that trial counsel chose to waive their opportunity to cross-examine Mr. Mincher on that particular day because they believed that it was reasonable for them to choose to prepare further and risk Mr. Mincher's death during those preparations rather than to go forward immediately with less preparation. One of Rice's lawyers testified at Rice's competency trial about the decision not to cross-examine Mr. Mincher immediately after the State's direct examination, stating as follows: "It was a strategic decision because we wanted to have an effective cross-examination." The fact that trial counsel's gamble unexpectedly failed to pay off in Rice's favor does not demonstrate that their gamble should be judged unreasonable, because "the distorting effects of hindsight" must be ignored in judging counsel's performance. *Strickland*, 466 U. S. at 689. Furthermore, even if we were to assume that trial counsel's decision to delay their cross-examination was unreasonable, Rice has failed to show anything specific and significantly helpful that could have been brought out under cross-examination of Mr. Mincher. Instead, the argument Rice makes about the prejudice stemming from trial counsel's decision to delay their cross-examination is essentially limited to simply naming general topics that might have been raised with Mr. Mincher on cross-examination, such as the possible limits of Mr. Mincher's ability to recall the type of automobile Rice drove, the fact that Mr. Mincher might not have preserved evidence of Rice's harassment, and the fact that Mr. Mincher might not have reported any harassment to the police. Rice has failed to demonstrate what specific, useful information on those topics trial counsel could have actually elicited from Mr. Mincher.

Rice also argues that trial counsel rendered ineffective assistance by failing to seek a jury instruction that explained that Mr. Mincher's testimony "was not subject to cross-examination by the defense." Because, as we held on interim review and have explained above, trial counsel strategically waived Rice's right to cross-examine on the day of Mr. Mincher's direct examination by the State, we do not believe that any special instruction on the matter would have been

warranted. Thus, trial counsel did not render deficient performance by failing to seek such an instruction.

Rice also argues that trial counsel rendered ineffective assistance concerning Mr. Mincher's deposition in that counsel failed to object to certain aspects of the State's direct examination during the deposition and failed to seek limiting instructions at trial regarding "the jury's use of documents referenced in the Mincher deposition or the information contained in the police report." Absent more specific argument and absent any citation to the record to assist us in our review of the record, we deem these portions of Rice's claim to have been abandoned. See Supreme Court Rule 22; *Hall v. Terrell*, 285 Ga. 448 (III) (679 SE2d 17) (2009) (addressing claims "lack[ing] sufficient argument and citation to allow them to be meaningfully addressed").

(c) At trial, one of the victims' neighbors testified that, sometime between 3:00 and 4:00 on the afternoon of the murders, she saw Rice's automobile parked in the victims' neighborhood and a man who looked like Rice reading a newspaper in the automobile. This witness testified that she was issued a traffic citation on her way home that afternoon. Rice argues that trial counsel rendered ineffective assistance by failing to obtain a copy of this traffic citation. We do not believe that trial counsel performed deficiently, because there is nothing in the record to suggest any reason that they should have doubted the general timing of this witness's account and because the precise timing of her traffic citation would not have been important. Furthermore, Rice has not shown that he was prejudiced by counsel's failure to obtain the traffic citation, because he has not been able to present a copy of the ticket, which has been destroyed.

(d) Rice's inculpatory manuscript, "Culture Shock," was first discovered by Rice's friend who was looking after his belongings. Rice's friend turned on Rice's computer, hoping to load games onto it for children to use, and the manuscript appeared on the monitor. The friend informed investigators, who were able to copy the manuscript from the computer's hard drive and print out a copy of the manuscript. Rice argues that trial counsel rendered ineffective assistance by failing to present expert testimony showing that the file containing the manuscript might have been altered after Rice's arrest. However, the record shows that trial counsel performed reasonably by consulting with a computer expert and using his assistance to prepare for cross-examination of the State's expert, who acknowledged at trial that it was impossible to determine if the manuscript had been altered. Furthermore, the additional expert testimony Rice presented at the hearing held on his motion for a new trial fails to show prejudice from trial counsel's actions, as that testimony is essentially the same as the State's expert's testimony at trial.

(e) While Rice's case was pending before this Court pre-trial on interim review, one of Rice's two attorneys accepted an offer of employment with the District Attorney's office and, therefore, ceased representing Rice. By the time this occurred, Rice's case had already been fully briefed, but it had not yet been orally argued. Rice argues that his remaining counsel rendered ineffective assistance by making the oral argument and allowing the case to be decided by this Court without first arranging for a replacement for the attorney who had left Rice's case. Even assuming that trial counsel performed deficiently by not immediately arranging for a replacement, we find that Rice has failed to show any resulting prejudice.

(f) Rice argues that trial counsel rendered ineffective assistance by failing to object to an argument by the prosecutor in the guilt/innocence phase asking the jurors to return a verdict on behalf of the victims and to "[i]magine the fear and fright" suffered by Marlee Mincher, the child who discovered her slain family members. Rice contends that this argument violated the "Golden Rule," which forbids any argument "that, regardless of the nomenclature used, asks the jurors to place themselves in a victim's position." *Braithwaite v. State*, 275 Ga. 884 (2) (b) (572 SE2d 612) (2002). It is arguable that trial counsel did not perform deficiently by failing to conclude at trial that there was any basis to object. See id. at 892-893 (Sears, P. J., concurring) (asserting that it was not improper to ask the jurors "to imagine 'what it must have been like' for the mother of one victim, who found the bodies"); *Carr v. State*, 275 Ga. 185 (2) (563 SE2d 850) (2002) (holding that it was not improper for the prosecutor to ask the jury to "be the voice of [the victim]"). Compare *Braithwaite* at 894-895 (Hunstein, J., dissenting) (joining the majority in finding a "golden rule" violation where the prosecutor asked the jury, "And what must it be like *to be* [the victim's] mother and find those bodies?" (emphasis supplied)); *Braley v. State*, 276 Ga. 47 (36) (572 SE2d 583) (2002) (holding that it was improper for the prosecutor to ask the jurors to "imagine what it was *feeling like* for [the victim]" (emphasis supplied)). However, even assuming that trial counsel performed deficiently by failing to object, we find no prejudice in light of the marginally prejudicial nature of the argument, the fact that the argument was made in the guilt/innocence phase, the overwhelming evidence of Rice's guilt, and the time elapsed between the argument and the jury's sentencing deliberations. See *Braley*, 276 Ga. at 55 (conducting a review of the prosecutor's argument, under the standard that this Court applies on direct appeal in death penalty cases where no objection was raised at trial, and concluding that there was no "reasonable probability" that the challenged argument changed

the jury's sentencing verdict); *Carr*, 275 Ga. at 186 (assuming arguendo that an alleged "golden rule" argument that trial counsel failed to object to was improper but concluding "that there is no reasonable probability that the erroneous comment contributed to the verdict").

(g) Rice argues that one of the three attorneys who represented him at trial was not qualified under the U.A.P. or the American Bar Association Guidelines, which both present standards for first and second chair lawyers serving in death penalty cases. See U.A.P. II (A); ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (2003), reprinted in 31 Hofstra L. Rev. 913. To the extent that this claim raises issues of trial court error, it is waived, because no relevant objection was made at trial. See *Gissendaner*, 272 Ga. at 713-714 (setting forth the waiver rule applied in death penalty cases). To the extent that this claim alleges the ineffective assistance of counsel, it is without merit. Rice was represented by two attorneys who were fully qualified, and the record shows that the third attorney entered the case just as the trial was beginning, had a minor role, and was fully supervised by the two lead attorneys. Thus, we find no deficiency in the performance of the two lead attorneys in allowing him to assist, which was both reasonable and compliant with the standards set forth in the U.A.P. and the ABA Guidelines. Furthermore, Rice has failed to show that any actions taken by the third attorney prejudiced his defense. His only attempt at showing prejudice is to argue that the third attorney should have proposed a limiting instruction that highlighted the lack of cross-examination of Trevor Mincher in his deposition. However, as we noted above, no such instruction would have been warranted in light of our holding on interim review that the defense had waived their right to cross-examination on the day of the State's direct examination.

(h) In the discussion above, we have found very little in trial counsel's performance that was arguably deficient under constitutional standards. However, we have assumed counsel's deficiency on several points. Considering the collective prejudice of those assumed deficiencies, we conclude they did not in reasonable probability affect the outcome of Rice's trial. *Holsey*, 281 Ga. at 811-812, n. 1 (holding that the combined effect of trial counsel's deficiencies should be considered). Accordingly, Rice's overall ineffective assistance of counsel claim must fail.

10. Rice claims that Georgia's lethal injection method is unconstitutional. In the trial court, the State consented regarding this issue to Rice's reliance on the record from another death penalty case. The trial court delayed ruling on Rice's motion until after the sentencing phase, but it then denied the motion in its order denying Rice's motion for a new trial. As we did in the case from which Rice's evidence was

drawn and in more recent cases relying on that same evidence, we find no error in the trial court's denying Rice's claim. See *Ledford*, 289 Ga. at 75 (citing *Nance*, 280 Ga. at 127).

*Appellate Review Issue*

11. As Rice concedes in his brief, this Court does not conduct cumulative error review regarding trial court error. See *Holsey*, 281 Ga. at 811-812, n. 1 (holding that the combined effect of trial counsel's deficiencies should be considered in the context of an ineffective assistance claim but reasserting that this Court does not apply a cumulative error rule to issues of trial court error). Furthermore, we find no trial court error to which such a review could even be applied.

*Sentence Review*

12. Upon our review of the record, we conclude that the sentences of death in this case were not imposed under the influence of passion, prejudice, or any other arbitrary factor. See OCGA § 17-10-35 (c) (1).

13. In its sentencing verdict, the jury found beyond a reasonable doubt regarding Connie Mincher's murder that her murder was committed during a burglary and that her murder was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, and an aggravated battery against her. See OCGA § 17-10-30 (b) (2) and (b) (7). The jury found beyond a reasonable doubt regarding Ethan Mincher's murder that his murder was committed during the commission of Connie Mincher's murder, that his murder was committed during a burglary, and that his murder was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, and an aggravated battery against him. Id. Upon our review of the record, we conclude that the evidence at Rice's trial was sufficient to support the statutory aggravating circumstances found as to both murders. See OCGA § 17-10-35 (c) (2) (requiring a review of the statutory aggravating circumstances found by the jury); U.A.P. IV (B) (2) (providing that, in all death penalty cases, this Court will determine whether the verdicts are supported by the evidence). See also *Ring v. Arizona*, 536 U. S. 584 (122 SC 2428, 153 LE2d 556) (2002); *Jackson*, 443 U. S. 307.

14. Considering both the murders in this case and Rice as a defendant, we find that the death sentences imposed were not disproportionate punishment within the meaning of Georgia law. See OCGA § 17-10-35 (c) (3); *Gissendaner*, 272 Ga. at 716-717 (holding that this Court's statutorily mandated proportionality review concerns whether a particular death sentence is excessive per se or is

substantially out of line). The cases cited in the Appendix support this conclusion, because each of them shows a jury's willingness to impose a death sentence for the commission of multiple murders, whether committed in one or more than one transaction. See OCGA § 17-10-35 (e).

*Judgment affirmed. All the Justices concur.*

APPENDIX.

*Tate v. State*, 287 Ga. 364 (695 SE2d 591) (2010); *Humphreys v. State*, 287 Ga. 63 (694 SE2d 316) (2010); *Stinski v. State*, 286 Ga. 839 (691 SE2d 854) (2010); *O'Kelley v. State*, 284 Ga. 758 (670 SE2d 388) (2008); *Rivera v. State*, 282 Ga. 355 (647 SE2d 70) (2007); *Williams v. State*, 281 Ga. 87 (635 SE2d 146) (2006); *Lewis v. State*, 279 Ga. 756 (620 SE2d 778) (2005); *Riley v. State*, 278 Ga. 677 (604 SE2d 488) (2004); *Franks v. State*, 278 Ga. 246 (599 SE2d 134) (2004); *Sealey v. State*, 277 Ga. 617 (593 SE2d 335) (2004); *Arevalo v. State*, 275 Ga. 392 (567 SE2d 303) (2002); *Raheem v. State*, 275 Ga. 87 (560 SE2d 680) (2002), disapproved on unrelated grounds by *Patel v. State*, 282 Ga. 412, 413, n. 2 (651 SE2d 55) (2007); *Lance v. State*, 275 Ga. 11 (560 SE2d 663) (2002); *Lucas v. State*, 274 Ga. 640 (555 SE2d 440) (2001); *Rhode v. State*, 274 Ga. 377 (552 SE2d 855) (2001); *Colwell v. State*, 273 Ga. 634 (544 SE2d 120) (2001); *Esposito v. State*, 273 Ga. 183 (538 SE2d 55) (2000); *Heidler v. State*, 273 Ga. 54 (537 SE2d 44) (2000); *Morrow v. State*, 272 Ga. 691 (532 SE2d 78) (2000); *Pace v. State*, 271 Ga. 829 (524 SE2d 490) (1999); *Cook v. State*, 270 Ga. 820 (514 SE2d 657) (1999); *DeYoung v. State*, 268 Ga. 780 (493 SE2d 157) (1997); *Raulerson v. State*, 268 Ga. 623 (491 SE2d 791) (1997); *McMichen v. State*, 265 Ga. 598 (458 SE2d 833) (1995).

DECIDED OCTOBER 29, 2012 —
RECONSIDERATION DENIED NOVEMBER 27, 2012.

*Ashleigh B. Merchant, Edwin J. Wilson*, for appellant.
*Patrick H. Head, District Attorney, John R. Edwards, Anna G. Cross, Assistant District Attorneys, Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Mary Beth Westmoreland, Deputy Attorneys General, Richard Tangum, Assistant Attorney General*, for appellee.