296 Ga. 598
FINAL COPY

S14P1344.  SPEARS v. THE STATE.

BLACKWELL, Justice.

A jury convicted Steven Frederick Spears of murder and other crimes, all

in connection with the killing of Sherri Holland.[1]  The jury found the existence

---

[1] Spears committed the crimes on August 24-25, 2001.  He was indicted by a Lumpkin County grand jury on November 19, 2001 and again on December 19, 2001, but both of these indictments were later withdrawn by nolle prosequi.  His final indictment was returned on January 6, 2003, and it charged him with malice murder, felony murder predicated on burglary, felony murder predicated on aggravated assault, felony murder predicated on kidnapping, aggravated assault, kidnapping with bodily injury, burglary predicated on an intent to commit a theft, and burglary predicated on an intent to commit murder. The State filed written notice on January 30, 2003 of its intent to seek the death penalty under this final indictment.  Jury selection was conducted from September 12-16, 2005; however, the trial court granted a continuance and dismissed the prospective jurors based on an e-mail that defense counsel received from a psychologist.  Jury selection began anew on March 5, 2007.  On March 20, 2007, at the conclusion of the State's guilt/innocence phase presentation, the trial court dismissed the count of the indictment alleging felony murder predicated on burglary, reasoning that the indictment failed to place Spears on notice of the particular type of burglary that was alleged in that count.  On March 21, 2007, the jury found Spears guilty on all of the remaining counts charged in the indictment.  On March 22, 2007, the jury recommended a death sentence for the murder.  Later on March 22, 2007, the trial court imposed a death sentence for the malice murder based on the jury's sentencing verdict and, although incorrectly referring to the process as "merg[ing]" counts, essentially and properly treated the two felony murder convictions as mere surplusage.  See OCGA § 17-10-31 (a) ("Where a statutory aggravating circumstance is found and a recommendation of death is made, the court shall sentence the accused to death.").  See also Hulett v. State, 296 Ga. 49, 53 (2) 766 SE2d 1) (2014); Malcolm v. State, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993); OCGA § 16-1-7 (a).  The trial court "merge[d]" the burglary count predicated on the intent to commit murder into the burglary count predicated on the intent to commit a theft, an error that we discuss in detail in Division 2. The trial court properly merged the aggravated assault count into the malice murder count.  See Hulett, 296 Ga. at 55 (2) (a).  The trial court then imposed the following terms of imprisonment, each to be consecutive to one another and to the death sentence:  life imprisonment for the kidnapping with bodily injury and 20 years for the burglary predicated on the intent to commit a theft.  On April 13, 2007, Spears filed a motion for a new trial, which he amended on August 18, 2009.  On September 20, 2012, the trial court granted the motion insofar as it alleged that the evidence was insufficient to prove the asportation element of the offense of kidnapping with bodily injury as that offense was defined at the time of Spears's crimes or to prove the related statutory aggravating circumstance involving kidnapping with bodily injury. Cf. Tate v. State, 287 Ga. 364, 365-366 (1) (a) (695 SE2d 591) (2010).  The motion was otherwise denied. Spears filed a timely notice of appeal on October 17, 2012, the appeal was docketed in this Court for the

of two statutory aggravating circumstances and recommended a death sentence for the murder. See OCGA § 17-10-30 (b). For the reasons set forth below, we affirm the convictions and sentences already imposed in this case, we vacate the erroneous merger of the two burglary counts, and we remand for the trial court to impose an appropriate sentence on the burglary count for which Spears has not yet been sentenced.

General Grounds

1. The evidence presented at trial, including Spears's audio-recorded confession at the sheriff's department, showed that Spears and Sherri Holland had previously dated each other but that their romantic relationship had ended. Spears admitted the following about the relationship: "I told her when we started dating a long time ago, if I caught her or found out she was screwin' somebody else, I'd choke her ass to death." He also admitted that he had told several other people the same thing about Ms. Holland.

Suspecting that Ms. Holland had been in a romantic relationship with someone else, Spears made preparations based on four separate plans for her murder. Regarding the first plan, Spears stated: "I was gonna shock her ass to

_____

September 2014 term, and the case was orally argued on September 8, 2014.

2

death." He entered the crawlspace under her house and used screws to attach wires to the drain pipe and the cold water pipe of her shower, which he planned to attach to the home's circuit board while Ms. Holland showered during a lightning storm when no one's suspicions would be raised by her electrocution. He bragged about this plan as follows: "I came up with that on my own. Pretty creative, ain't it." His second plan for the murder involved his carving a baseball bat from a tree branch, leaving it under a canoe at Ms. Holland's house, and beating her to death with it. His third plan involved his crawling into her house through an air conditioner vent from the crawlspace and loading her shotgun for future use during the murder. Regarding this plan, he stated: "Because if she brought somebody else in there I was just gonna shoot him." His fourth plan was to choke her, bind her with duct tape that he had hidden inside her house, and suffocate her with a plastic bag. For this plan, he hid duct tape under her canoe.

After making the arrangements described above during previous illegal entries, Spears entered Ms. Holland's house again on August 25, 2001, for the purpose of actually committing the murder. Ms. Holland's son was staying with her ex-husband that night, and Spears hid in the son's closet from 10:00 p.m. on

3

August 24 until 2:30 or 3:00 a.m. on August 25, when he was certain that she had fallen asleep. He entered her bedroom and told her to roll over so that he could bind her hands and feet with duct tape. She struggled with him, and he struck her in the head with his fist as she was attempting to flee the bedroom. The struggle moved into the hallway just outside her bedroom, and it continued for five to ten minutes, according to Spears's estimate. Spears recounted her last words as follows: "Last thing she said was she loved me. Swear to God, that's the last thing she said. Last words came out of her mouth." When asked what his reply had been, he stated: "I love you, too. Then I choked her ass right out." Once he choked her to unconsciousness in the hallway by wrapping his arm around her neck, he dragged her the short distance back into the bedroom. He bound her hands and feet with duct tape, wrapped her face and mouth with duct tape, placed a plastic bag over her head, and secured the bag with duct tape. He then placed her head on a pillow "so her face wouldn't be smashed on the floor." He locked the padlock on the outside of her bedroom door that she used to keep her son from entering her room, took her purse, and left through her back door. He drove in her automobile back to where he had left his own automobile, but he then realized that he had failed to take her cigarette case, in which she

4

typically kept her money. He returned to her house, reentered her house, took her cigarette case money, and drove to his own house.

At his house, he changed out of his pants that Ms. Holland had urinated on while he choked her, and he got his shotgun and ammunition. As he drove away at approximately 5:00 a.m., a man in a red pickup truck began following him. In turn, he began following the truck. He planned to shoot the driver of the truck if the driver turned into a church parking lot, but the truck stopped next to another vehicle coming out of the church parking lot, blocking his way. Regarding this planned additional murder, he stated as follows: "Look, one, two, three; what difference does it matter. You know what I'm saying. I've done went as far as I can go. What difference does it matter what I do now." He added: "If you're gonna go to Hell, one sin or ten sins, what difference does it make." This additional murder never occurred, however, because the person in the truck pulled up next to another vehicle and Spears did not want to kill "an innocent bystander." As shown by a receipt discovered by investigators in Ms. Holland's automobile, Spears drove to a store, where he bought fishing supplies, a fishing license, a hat, and paint that he planned to use to conceal the black stripes on Ms. Holland's red automobile. He abandoned her automobile when

5

he began to fear that it had an anti-theft tracking device. He lived in the woods for ten days, sleeping in a deer stand. At one point, he was followed by men in camouflaged suits, and he said about them in his confession: "You know, if I'd had knew that they were just old bullshit people, I'd [have] shot 'em. I thought they were cops or something."

The investigation into Ms. Holland's murder began on the afternoon following the murder, after her ex-husband and son searched for her when she failed to pick up her son, could not locate her, and called the police. Officers detected a foul odor coming from the victim's bedroom, removed the hinges from her padlocked bedroom door with the assistance of her son, and discovered her lifeless, decomposing body lying face down on a pillow with her hands and feet bound behind her with duct tape and a plastic bag over her head secured with duct tape. The thermostat in the home had been turned all the way up, and the home was very hot inside. A flashlight not belonging to Ms. Holland or her son was discovered in the foyer. A search of the crawlspace revealed a colored light bulb that Spears had used to provide inconspicuous lighting as he prepared for the murder, and the light bulb was connected to Spears through a receipt discovered in his automobile. A search of Spears's house revealed Ms.

Holland's purse and a wrapper from a roll of duct tape. A search of his automobile revealed a roll of duct tape with cut marks and other characteristics matching those on the end of the piece of tape used to bind Ms. Holland's hands, along with a receipt for a colored light bulb and a flashlight. An autopsy showed that Ms. Holland was injured from a blunt force trauma to her head, suffered abrasions to her knee consistent with having fallen onto a ventilation grate, and died from asphyxia as a result of being choked, having tape wrapped around her mouth and face, and having a plastic bag placed over her head. A warrant was obtained for Spears's arrest. Ten days after the murder, an officer spotted Spears walking along a highway, asked him for his name, and arrested him. He claimed that he was walking back to Lumpkin County to call the police and turn himself in. He was taken to the sheriff's department, where he gave a detailed confession, which has been referenced at several points above. Near the end of his confession, Spears commented as follows on Ms. Holland's murder: "I loved her that much. I told her I wasn't letting her go, and I didn't." He added, "[I]f I had to do it again, I'd do it."

Upon our review of the record, we conclude that the evidence presented at trial and summarized above was sufficient to authorize a rational trier of fact

to find beyond a reasonable doubt that Spears was guilty of the crimes of which he was convicted. See Jackson v. Virginia, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). See also Unified Appeal Procedure IV B. 2. (providing that, in all death penalty cases, this Court will determine whether the verdicts are supported by the evidence).

2. As noted in footnote 1, the trial court "merge[d]" the two counts of burglary upon which Spears was found guilty by the jury, one predicated on the intent to commit a theft and one predicated on the intent to commit the felony of murder. Where one course of conduct violates one criminal statute in several ways described in the statute, a defendant is guilty of only one crime. See Stinski v. State, 286 Ga. 839, 841 (1) (691 SE2d 854) (2010) (directing the trial court to vacate one of two convictions for arson); State v. Marlowe, 277 Ga. 383, 383-384 (1) (589 SE2d 69) (2003). However, the evidence in Spears's case showed that he made one entry of Ms. Holland's house with the dual intent to commit a theft and to murder her but that he then left the victim's house, drove to a church, returned to the house after realizing that he had failed to steal the victim's cigarette case containing money, and reentered the house with the intent to commit the theft of the cigarette case and money. Under the facts of this case,

8

Spears's two separate entries into the house constituted two separate violations of the burglary statute. Thus, the trial court erred by "merg[ing]" the burglary counts in its sentencing order, the erroneous merger must be vacated, and the trial court is directed to enter a sentence on the second of those burglary counts. See Hulett v. State, 296 Ga. 49, 54 (2) (766 SE2d 1) (2014) (holding that this Court should direct the trial court to correct the erroneous vacating or merging of a conviction where the error is apparent on appeal, regardless of whether the matter is raised by the State on appeal).

### Pretrial Issues

3. Spears argues that the trial court erred by refusing to quash his indictment based on the fact that a jury commissioner served on the grand jury that indicted him and as that grand jury's clerk. The grand juror in question was randomly selected from the large master list of potential jurors approved by the full jury commission. She could not recall Spears's case specifically and did not believe that she ever knew Spears's victim, Ms. Holland. See also Brown v. State, 295 Ga. 240 (759 SE2d 489) (2014) (holding that the impartiality of one or more grand jurors does not render an indictment invalid). Spears claims that this grand juror suffered from a conflict of interest, but he relies exclusively on

9

irrelevant case law concerning the ethical duties of judges and lawyers. He also argues that the grand juror in question would have had an undue influence over the other grand jurors, but it is unclear to us why this would be the case any more so than with grand jurors holding any number of other positions in society, and such a heightened influence would not be disqualifying even if it existed. See id. Persons who hold or have recently held "elective office" are prohibited from serving on grand juries, but the grand juror in question here was appointed to the jury commission, not elected. OCGA § 15-12-60 (b). See Ingram v. State, 253 Ga. 622, 624-625 (1) (a) (323 SE2d 801) (1984) (defining "elective office" for purposes of grand jury service). Because Spears has failed to demonstrate otherwise, we conclude that the trial court did not err by denying his motion to quash his indictment based on this grand juror's service.

4. Spears argues that the trial court erred by denying his motion to suppress the statements that he made as he was transported from the scene of his arrest to the sheriff's department. The evidence showed that a sheriff's deputy, after identifying Spears and confirming the existence of a warrant for his arrest, handcuffed Spears and placed him in the back seat of a patrol vehicle. The deputy testified that Spears, without any questioning, began talking. The deputy

testified that he opened the partition separating the back seat from the front seat so that he could hear what Spears was saying. The deputy also activated a microphone in the back seat of the vehicle so that the vehicle's video recorder would record Spears's words. The audio portion of the recording, however, is mostly unintelligible. The parties agree that Spears was under arrest and that no Miranda warnings were administered. See Miranda v. Arizona, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966). The deputy testified that Spears began speaking without any prompting and that the deputy only asked "[c]larifying questions." The deputy testified that the only such questions that he asked concerned Spears's account of being followed by unknown persons wearing camouflage sometime during the nearly two weeks that he spent hiding in the woods. The deputy testified that he concluded from his conversation with Spears that the unknown persons were likely hunters. Spears argues on appeal that his statements in the patrol vehicle were the result of interrogation by the deputy and that, because no Miranda warnings were given, the statements should have been suppressed. But two-and-a-half years after the evidentiary hearing on Spears's motion to suppress, after the State moved the trial court for a ruling on the matter, the trial court inquired of defense counsel whether "the

11

defendant ha[d] anything to go forward on those statements." Defense counsel replied: "Although in custody, they were not as a result of interrogation and therefore <u>Miranda</u> would not be applicable and we have nothing to present for that at this time." Three days later, the trial court issued an order denying Spears's motion to suppress, concluding as follows:

> [T]he court finds that those statements were not the result of any custodial interrogation as the evidence is uncontradicted that there was [sic] no questions from Deputy Wallace directed to the Defendant Steven Spears concerning the charge for which he was arrested. Furthermore, the court finds that all statements made by Mr. Spears were made voluntarily, that there was no promise or slightest hope of benefit or reward made to Mr. Spears for such statement, and that there was not the remotest fear or threat of injury or of coercion. Furthermore, the evidence is that all statements made by the Defendant were the result of the Defendant's free and voluntary choice to talk without any prompting or questioning.

To the extent that this ruling might have been erroneous, the error was induced by Spears's concession that his statements were not the result of interrogation and that <u>Miranda</u> did not apply to them. Therefore, Spears has waived his right to complain on appeal regarding the admissibility of the statements. See <u>Stinchcomb v. State</u>, 280 Ga. 170, 173 (4) (626 SE2d 88) (2006) ("A party cannot complain [on appeal] about errors he helped induce.").

Furthermore, even if this issue had been preserved for appeal, we would conclude that any error in refusing to suppress Spears's statements inside the patrol vehicle was harmless beyond a reasonable doubt. See Chapman v. California, 386 U. S. 18, 24 (III) (87 SCt 824, 17 LE2d 705) (1967) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."). At trial, the State presented testimony from the deputy about Spears's statements inside the patrol vehicle, but it did not play the mostly unintelligible recording. The deputy's trial testimony recounted only Spears's statements about his intention of turning himself in to the authorities, about his living in the woods for nearly two weeks, about his being followed by unknown persons in camouflage, and about his being upset when the newspaper failed to report on the case because it left him uncertain of whether the victim had survived. Spears discussed each of these same general topics in his later recorded statements at the sheriff's department. The admissibility of these later statements at the sheriff's department does not depend on whether the earlier statements in the patrol vehicle were admissible because, as is discussed further below, the later statements at the sheriff's department were preceded by Miranda warnings, were

13

made after Spears signed a waiver of his <u>Miranda</u> rights, were made an hour-and-a-half later, were made to different law enforcement officers, and were made without the new officers' reminding Spears of any of his statements in the patrol vehicle. Cf. <u>Missouri v. Seibert</u>, 542 U. S. 600 (124 SCt 2601, 159 LE2d 643) (2004).

5. Spears argues that his statements at the sheriff's department after his arrest were not "made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury." Former OCGA § 24-3-50.[2] He also argues that his waiver of his constitutional rights under <u>Miranda</u> was not voluntary. See <u>Miranda</u>, 384 U. S. 436. We find no merit to these claims.

The uncontested evidence in the record shows that, at the time of his arrest, Spears had been sleeping in a deer stand in the woods for ten days. Spears was stopped by the arresting officer at approximately 4:39 p.m., he arrived at the sheriff's department at approximately 4:55 p.m., and almost immediately upon his arrival, he made his first contact with the sheriff's investigator who would eventually participate in his interview. The sheriff's investigator did not interview Spears immediately but instead waited for the

---

[2] This provision of the Code is now found at OCGA § 24-8-824.

arrival of a GBI agent. The arresting officer testified that Spears was dirty and unshaven when he was arrested. The sheriff's investigator testified that Spears looked hungry and tired upon his arrival at the sheriff's department, but he also testified that Spears was given food and drink in an interview room and was allowed to smoke outside. The GBI agent arrived at the sheriff's department at approximately 6:00 p.m. The agent testified that Spears was dirty and unshaven and that Spears claimed to have been sleeping in the woods for approximately two weeks, but the agent denied that Spears appeared tired or that Spears claimed to have not slept or eaten much in several days. He summarized Spears's appearance by stating simply: "He looked like somebody that had been camping out." The agent ensured that Spears had been given something to eat and drink since his arrival at the sheriff's department. A written waiver of <u>Miranda</u> rights was then presented to Spears at 6:04 p.m., and Spears verbally acknowledged each of his rights and signed the form.[3] In his subsequent audio-

---

[3] The GBI agent testified that his recollection of the time that the waiver form was presented to Spears was refreshed from the form itself, which clearly states that the form was presented to Spears at 18:04, military time for 6:04 p.m. The agent then answered affirmatively when asked, according to the transcript, whether the form was presented at "8:04." In light of the agent's previous statement regarding the form and in light of the testimony from the sheriff's investigator that the interview was conducted "immediately" following the GBI agent's arrival at approximately "six o'clock," it appears reasonably certain that the waiver form was presented at 6:04 p.m. Furthermore, our reasoning here would not be affected if Spears actually rested, ate, drank, and

recorded interview, which this Court has independently reviewed, Spears appears to be alert and to understand his situation.

As outlined above, Spears was given food and drink and was allowed to smoke prior to being asked if he wished to waive his Miranda rights and be interviewed. Thus, we find Spears's argument to be illogical insofar as it asserts that his subsequent waiver of rights was involuntarily given because of his desire to eat, drink, and smoke. See also Brown v. State, 290 Ga. 865, 868-869 (2) (b) (725 SE2d 320) (2012) (holding that a "hope of benefit" arises from "promises related to reduced criminal punishment — a shorter sentence, lesser charges, or no charges at all"); White v. State, 266 Ga. 134, 135 (3) (465 SE2d 277) (1996) ("The promise of a benefit that will render a confession involuntary under [former] OCGA § 24-3-50 must relate to the charge or sentence facing the suspect."). We also find no support in the record for Spears's assertion that a lack of sound sleep made him vulnerable to being seduced by a "hope of benefit" within the meaning of Georgia law or rendered his waiver of Miranda rights and subsequent statement involuntary under constitutional standards. See id. See also Bunnell v. State, 292 Ga. 253, 255 (2) (735 SE2d 281) (2013)

---

smoked for two extra hours before being interviewed.

16

(holding that the State bears the burden to prove the voluntariness of a statement by a preponderance of the evidence). We also reject Spears's suggestion that the statutory or constitutional analysis here should be affected by an alleged breaching of the standard operating procedures of the sheriff's department by taking Spears for interrogation in an office at the sheriff's department prior to booking him at the adjacent jail, even if such a breach were assumed to exist here.

6. Spears argues that the trial court erred by refusing to suppress the evidence seized from his automobile pursuant to a search warrant. The warrant was obtained and executed on the morning of August 27, 2001, which was the day after the murder. Pretermitting the State's argument that a certain written order issued pretrial, combined with a verbal exchange between defense counsel and the trial court at trial, should not be deemed to have preserved this claim for review on appeal, we reject the claim for the simpler reason that it plainly lacks merit.

When considering whether to issue a search warrant, the magistrate or judge must make

a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

State v. Stephens, 252 Ga. 181, 182 (311 SE2d 823) (1984). The magistrate or judge must view the totality of the circumstances, and she must look "for indications of the existence of reasonable probability that the conditions referred to in the sworn testimony would continue to exist at the time of the issuance of the search warrant." Lewis v. State, 255 Ga. 101, 104 (2) (335 SE2d 560) (1985). On appeal, this Court's duty is to ensure that the magistrate or judge had a substantial basis for concluding that probable cause existed. See Stephens, 252 Ga. at 182.

In Spears's case, the affidavit presented to the magistrate who signed the search warrant, although not ideally drafted in every regard, provided a great deal of information connecting Spears and his Ford Taurus to the murder of Ms. Holland. The affidavit described the state of Ms. Holland's body when it was discovered, including the fact that she had been bound with duct tape and had a plastic bag placed over her head. The affidavit did not specifically state that the officer who sought the warrant actually observed the body, but the context

18

strongly implied that the body was discovered, or at least observed, by law enforcement officers. The affidavit clearly stated that law enforcement officers interviewed Derrick Holland, Ms. Holland's son, and learned that a romantic relationship between Spears and Ms. Holland had ended two months earlier, that Ms. Holland was afraid of Spears, and that Ms. Holland believed that Spears, although at an unspecified time, had been underneath her home. The affidavit stated that law enforcement officers learned from a friend of Ms. Holland that Spears, although at an unspecified time, had shoved Ms. Holland and had threatened to strangle her. The affidavit stated that Ms. Holland visited her former sister-in-law in person on the night before the murder, showed the sister-in-law a green light bulb that she had found under her house, and told the sister-in-law that she was afraid of Spears, that Spears had said that he would see her dead before he would see her dating someone else, and that, although at unspecified times, Spears had been under her house tapping her telephone. The affidavit stated that a search of Ms. Holland's house by the affiant had revealed an insurance policy belonging to Spears that named his vehicle as being a 1993 Ford Taurus. Finally, the affidavit stated that law enforcement officers had discovered a 1993 Ford Taurus parked about a half of a mile from Ms. Holland's

19

house, with a tag number found to be registered to Spears and Ms. Holland and with a partially used roll of duct tape and a receipt for a party light bulb visible in plain view. Applying the standards described above, we conclude that the affidavit provided a sufficient basis for the issuance of the warrant for a search of Spears's Ford Taurus.[4]

### Jury Selection Issues

7. Spears argues that the trial court erred by refusing to excuse several prospective jurors based on their alleged unwillingness to consider all three sentencing options. A juror is unqualified to serve if he or she favors the death penalty so strongly that he or she would be prevented from or substantially impaired in the performance of his or her duties as a juror in accordance with the trial court's instructions and the oath taken by the jurors. See Lance v. State, 275 Ga. 11, 15 (8) (560 SE2d 663) (2002). The same standard applies where a juror is allegedly unqualified based on his or her disfavor toward a life sentence with or without parole. Id. at 16 (9). In evaluating a trial court's application of

---

[4] Because we hold that there is no merit to Spears's assertion that the warrant was not supported by a showing of probable cause to the magistrate, we need not address the question, not raised by the parties in the trial court or on appeal, of whether the search was also justified under the "automobile exception" to the warrant requirement. See State v. Lejeune, 276 Ga. 179, 182-183 (2) (576 SE2d 888) (2003).

this standard, this Court will consider a juror's voir dire responses as a whole, will give deference to the findings of the trial court, and will upset the trial court's findings only upon a showing of an abuse of the trial court's discretion. Id. at 15-16 (8), 16 (9). "Because a defendant is entitled to a full panel of qualified jurors at the beginning of peremptory strikes, 'the erroneous qualifying of a single juror for the panel from which the jury was struck' would require reversal." Rice v. State, 292 Ga. 191, 194-195 (3) (733 SE2d 755) (2012) (quoting id. at 15 (8)).

(a)   Juror Harkins indicated that he understood the bifurcated trial procedure, did not oppose the death penalty, would not automatically impose a death sentence, and would consider all three sentencing options. He later stated, "[I]f the evidence shows that a person has committed a crime that by law is punishable by death, then I can abide by that." Then, when asked if he "would automatically give the death penalty if they are found guilty of [an] offense punishable by death," he replied, "Only if the evidence proved they was." However, he later explained as follows regarding the three sentencing options for murder: "If I was given those options, then I would have to weigh each one to see which one would be the fair and impartial [sic]." Even when the specific

factual allegations in the indictment were recited, he stated regarding the sentencing options, "I'd have to give all three of them equal consideration." Finally, he explained that, despite his comment about situations where "the law was dictating" a death sentence, he would consider all three sentencing options under the law as it had been explained to him. Considering Juror Harkins's voir dire as a whole, we conclude that the trial court did not abuse its discretion in concluding that he was qualified to serve.

(b) Juror Saba stated that she would not automatically impose a death sentence upon finding a defendant guilty of murder and that she would keep an open mind to all three sentences. When asked for her general views on the death penalty, she explained that she was "for it in some cases and not for it in other cases," that her "automatic reflex" was for a death sentence in cases involving children, and that she would not want a person "living in prison off the taxpayers forever" if the person were a "sociopath." She added, however, that "it would depend on the situation." She even confirmed that she would consider all three sentencing options if the specific factual allegations in Spears's indictment were proven. She indicated that she would lean against allowing for parole but that she would give it "meaningful consideration" and would not be

22

"dead set" against it. See Lance, 275 Ga. at 16-17 (9) (a) (holding that a juror who stated that he "might favor or 'lean towards' the death penalty" but who stated that he would consider all three sentencing options was not unqualified); Pace v. State, 271 Ga. 829, 834 (7) (524 SE2d 490) (1999) ("A prospective juror is not subject to excusal for cause for merely leaning for or against a death sentence.").

(c) Juror Allen initially stated under questioning by the trial court that he would automatically vote for a death sentence upon a conviction for murder without considering all of the evidence and the law given, then stated that he would give death only if a defendant were found guilty, and then stated that he would not vote for death automatically if the law said he could only do so under certain circumstances. However, when asked by the prosecuting attorney to give his general views on the death penalty, he stated, "It just depends on the crime," and he indicated that some crimes are "harsh, cruel murder" while others, like accidental killings, are not. When asked whether he could consider life with the possibility of parole upon a conviction for murder, he stated, "Depending on the circumstances," and he confirmed that he would also consider the other two possible sentences. He also confirmed that he would keep an open mind until

23

he heard all of the evidence and instructions. Under questioning by defense counsel, he indicated that giving a death sentence for him was not just based on guilt, that he "believe[d] in all three" options, and that "it's all depending on the case whether [he] would vote" for the death penalty. He confirmed that he would consider all three options even if the specific factual allegations in Spears's indictment were proven. Finally, he stated, "I guess so," when asked if he thought that the death penalty should be <u>sought</u> in every murder case. Considering Juror Allen's voir dire as a whole, we conclude that the trial court did not abuse its discretion in concluding that he was qualified to serve.

(d) Although not noted by the parties, our review of the record reveals that Juror Woodford was not on the list of potential jurors from which the jurors who actually deliberated were stricken. Accordingly, we need not address whether he was qualified to serve. See <u>Heidler v. State</u>, 273 Ga. 54, 57 (3) (c) (537 SE2d 44) (2000) (holding that the erroneous qualifying of a potential juror is harmless if he or she was not among those potential jurors from which the jurors who actually deliberated were selected).

8. Spears argues that the trial court erred by excusing two prospective jurors who he claims, contrary to the trial court's findings, would have been

willing to consider a death sentence for murder. The same standard applies to this claim as applies to claims regarding jurors' willingness to consider the other two sentencing options for murder. See Lance, 275 Ga. at 17 (10). As set forth in greater detail below, we find no abuse of the trial court's discretion in excusing these two jurors.

(a) Juror Hall stated under questioning by the trial court that she was not opposed to the use of the death penalty, but she then added that her views might "[p]ossibly" substantially impair her ability to follow the law in sentencing and that she would have "a hard time" with having someone's life in her hands. She stated: "I would definitely try to follow the law, I mean, but subconsciously, you never know what happens." Under questioning by the prosecuting attorney, she stated that it bothered her somewhat that, according to what she had heard, it costs more to execute someone than to keep him or her in prison, that she "honestly d[id]n't know" if she could keep an open mind to all three sentencing options, that she "would really try very hard" to follow the trial court's instructions, and that, based on her lack of knowledge about the case, she would wait to hear all of the evidence before making up her mind. The defense then asked no questions on her sentencing views. When questioned further by the

25

prosecuting attorney regarding her ability to vote for death, she said: "I don't know. I mean, I do — I believe in the death penalty, but I have a hard time deciding the fate of someone else's life." She then said that, although "different evidence might be able to sway [her] opinion," she would have a "very hard time" sentencing someone to death. When further questioned by the trial court about whether she could consider a death sentence, she said: "I mean, I cannot say 100 percent yes, so I guess I should say no." She added: "Because no matter what somebody does, I don't want to be the person that says you have to die now. I mean, I don't think I can do that." She also said: "I don't think I could say you can serve a little bit in jail and maybe be paroled later on. I don't think I can do that, either. I don't think that would be an option." Spears argues that this Court should consider, in addition to her responses regarding the death penalty, Juror Hall's responses concerning the personal hardship that jury service in the case might cause her, suggesting that she might have been seeking to be found unqualified. Considering her voir dire as a whole, we conclude that the trial court did not abuse its discretion in finding Juror Hall to be unqualified based on her impaired ability to consider a death sentence or a sentence of life with the possibility of parole.

26

(b) Juror Flanagan, under questioning by the trial court, stated: "Well, I always thought [that the death penalty] was a good idea, but if I was put on the spot to make that decision, I don't know if I could do that." She also indicated, however, that she could give meaningful consideration to all three sentencing options. Under questioning by the prosecuting attorney, she again indicated that she would keep an open mind regarding all three options. She then stated, when asked if she could impose a death sentence: "I believe — I believe I could. I just — I don't know." When asked if she could affirm a death sentence during the polling of the jury, she indicated that she could not. She then stated regarding whether she could vote for a death sentence: "That's a lot of responsibility. I don't know if I could live with that." When the trial court asked her again if she could consider all three options, she stated: "Well, I feel like I can, but then when it comes right down to it, when I picture myself being in that position, I just don't know if I could actually make that decision." Finally, when the trial court asked her to state whether she believed that she could vote for a death sentence, she stated: "No. I don't think so." Considering her voir dire as a whole, we conclude that the trial court did not abuse its discretion in finding Juror Flanagan to be unqualified.

9. Spears argues that the trial court erred by refusing to excuse Juror Walker. In her voir dire, Juror Walker stated that her husband had died approximately three months earlier and that her mother-in-law had died approximately two months earlier, that she was sometimes distracted or forgetful, that she sometimes cried because she was now living alone, that her responsibilities, including settling her husband's and mother-in-law's estates, "would be in the back of [her] mind the whole time" during her sequestration for trial, and that she did not think that she could focus totally on the trial without having thoughts of "all the stuff piling up for [her] to have to take care of." When asked a follow-up question about whether she would be unable to concentrate in court, she responded: "I think I — in court I would listen to what was happening in court and when we went to the hotel room and you had to — I think that I would be thinking what's happening at home or what came in the mail or what else is going on." She also indicated that her anxiety about her outside responsibilities would be diminished if she were allowed to attend to estate matters and speak to her sons in the evenings. The trial court did not abuse its discretion in denying Spears's motion at the conclusion of this portion of Juror Walker's voir dire on the ground that "she's just got too much going on

28

in life right now." See Gulley v. State, 271 Ga. 337, 344 (7) (519 SE2d 655) (1999).

After the jury was selected and sworn, Juror Walker presented a letter written by a physician to the trial court, which prompted further voir dire. She stated that she sometimes took a prescription drug, which she stated was "Xanax, Valium." She stated that she took the drug "[a]s needed for sleep or for rest" but that she had not taken the drug on the day of her initial voir dire, which had occurred in the afternoon. She stated that the only daytime side effect of the drug following her taking it at night was some sleepiness, but she added that she was always able to conduct her work as a dental hygienist without any difficulty beginning at 8:00 a.m. following her having taken the drug at night. She responded affirmatively when the trial court asked her if she would "be awake and alert and do the job as a juror just as well" even if she were to take the drug at night, which she indicated that she had done the night before. Although defense counsel stated that he intended to rely solely on the defense motion made during Juror Walker's initial voir dire and would otherwise "remain moot [sic]," the trial court made a finding that her subsequent voir dire did not show

her to be an unqualified juror. Pretermitting whether the matter was waived by counsel's comments preceding this finding, we hold that the trial court did not abuse its discretion in making that finding. Cf. Stokes v. State, 281 Ga. 875, 878 (4) (644 SE2d 116) (2007) (finding no abuse of discretion where the trial court excused a prospective juror based on his "twice daily" use of a prescription drug for back pain, his use of a prescription drug for a mental illness, and his inability to concentrate).

Guilt/Innocence Phase Issues

10. Spears argues that the trial court erred by admitting a photograph of a portion of the victim's skull taken after an incision was made and her scalp was partially pulled back. The trial court did not abuse its discretion in admitting this photograph, because it depicted a hematoma below the surface of the scalp that was not visible prior to the autopsy. See Brown v. State, 250 Ga. 862, 867 (5) (302 SE2d 347) (1983) ("A photograph which depicts the victim after autopsy incisions are made or after the state of the body is changed by authorities or the pathologist will not be admissible unless necessary to show some material fact which becomes apparent only because of the autopsy."). See also Bunnell, 292 Ga. at 258 (5) (applying an abuse of discretion standard

30

regarding the admission of post-autopsy photographs).  Contrary to Spears's argument, it is irrelevant that the incision that revealed the injury below the scalp passed through a bruise visible on the surface of the scalp, because the photograph of the injury below the scalp was necessary to show the full extent of the victim's head injury.

Sentencing Phase Issues

11.  Spears argues that the prosecuting attorney made several improper arguments at the conclusion of the sentencing phase.  We find no reversible error.

In his closing argument in the sentencing phase, the prosecuting attorney reminded the jury of the portions of Spears's confession where he admitted that he had intended to murder the driver of the pickup truck that followed him after the murder of Ms. Holland, that he would have murdered the persons who followed him in the woods if he had known that they were not police officers, that he would have murdered anyone that Ms. Holland had brought home with her on the night of her murder, and that he believed that it did not matter if he

31

murdered one, two, or three other persons. The prosecuting attorney then argued as follows:

> If given the chance, this man in the future will kill again. If he gets a life sentence and is serving time in prison, it could be a prison guard, it could be a fellow inmate. If he ever escaped, it could be you, it could be a family member, another innocent bystander.

Spears objected to this argument, arguing that it was speculative regarding the future, and the prosecuting attorney responded by arguing that "the State gets to argue future dangerousness." The trial court overruled Spears's objection. Later in his argument, the prosecutor argued as follows: "[H]e is a cold-blooded killer and if he ever gets the chance to do it again, he will, and the State would urge you to take care of this rabid animal, do the right thing." Spears raised no further objection at this point.

(a) About future dangerousness, this Court has said:

> An argument that a death sentence is necessary to prevent future dangerous behavior by the defendant in prison must be based on evidence suggesting that the defendant will be dangerous in prison. "Arguments addressing [future dangerousness] are not improper if based on evidence adduced at trial." But it is improper for the State to argue that a defendant will kill in prison simply because he killed while free.

Henry v. State, 278 Ga. 617, 619-620 (1) (604 SE2d 826) (2004) (footnotes omitted; alteration in original).[5] As outlined within the prosecuting attorney's closing argument, Spears's confession showed that he was willing to and had planned to commit other murders and that he had no concern about the number of murders that he might commit. Furthermore, there were other aspects of his confession not referred to by the prosecuting attorney but summarized above that further supported the notion that he represented a future danger, including these statements: "What difference does it matter what I do now?" and "If you're gonna go to Hell, one sin or ten sins, what difference does it make?" Contrary to Spears's argument, the fact that he was arrested while attempting to turn himself in after having hidden in the woods for ten days and the fact that he was cooperative once arrested do not eliminate the probative nature of the statements that he made in his confession showing his willingness to kill again whenever it might serve his purposes. Thus, we conclude that the trial court properly overruled Spears's objection alleging that the prosecuting attorney's argument regarding future dangerousness was based on mere speculation.

---

[5] In Henry, a majority of the Court said these things — relying on an earlier special concurrence – over the dissent of three Justices. We need not address the correctness of these statements because, even if they are right, there is no reversible error in this case.

(b) Spears also argues that the prosecuting attorney's argument described above violated the "Golden Rule." The "Golden Rule" prohibits any argument "that, regardless of the nomenclature used, asks the jurors to place themselves in a victim's position." Braithwaite v. State, 275 Ga. 884, 885 (2) (b) (572 SE2d 612) (2002). A "Golden Rule" argument "is generally impermissible because it encourages the jurors to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." 75A Am. Jur. 2d Trial § 547 (2014). This Court has not previously addressed the application of the "Golden Rule" to the jury's consideration during the sentencing phase of the possible future acts of a defendant. Nevertheless, we conclude now that the prosecuting attorney violated the "Golden Rule" and improperly attempted to personalize the sentencing question for the jury by arguing, "If he ever escaped, it could be you."

Because Spears did not raise any objection at trial regarding the "Golden Rule," his claim on appeal based on it is waived insofar as it concerns his convictions. See Gissendaner v. State, 272 Ga. 704, 713 (10) (b) (532 SE2d 677) (2000). However, as part of our analysis of whether a death sentence has been "imposed under the influence of passion, prejudice, or any other arbitrary

factor," we consider whether any improper arguments by the prosecuting attorney in reasonable probability changed the jury's sentencing verdict. OCGA § 17-10-35 (c) (1). See Gissendaner, 272 Ga. at 714 (10) (b). See also Braley v. State, 276 Ga. 47, 54-55 (36) (572 SE2d 583) (2002) (addressing a "Golden Rule" argument that was not objected to at trial in a death penalty case). Upon our examination of the entire trial record, we conclude that the absence of the prosecuting attorney's violation of the "Golden Rule," which was a marginal one whose impropriety was not obvious from our prior case law, would not in reasonable probability have changed the jury's sentencing verdict.

(c) Finally, Spears notes in his argument regarding the prosecuting attorney's argument on future dangerousness that the argument referred to Spears as a "rabid animal." This reference apparently connects with the following argument that the prosecuting attorney had made earlier:

> Yesterday the defendant's sister got on the stand and talked about him having a bad childhood. His bad childhood is like being bitten by rabies. It's a disease that gets in you and takes time to grow and it manifested itself the day he planned to kill Sherri Holland. What about Derrick's [the victim's son's] childhood? The defendant is passing this disease on to Derrick, and if he gets a chance, to anyone else. Please keep that in mind.

Thus, the reference to rabies was, at least initially, a proper illustration used to respond to Spears's mitigating evidence. Nevertheless, we find that the final reference to Spears as a "rabid animal" was "'unnecessary and undesirable.'" Ellington v. State, 292 Ga. 109, 144 (10) (d) (735 SE2d 736) (2012) (citation omitted). However, Spears raised no objection to the use of this phrase, which would not have formed the basis for reversal even if it had been objected to and had been erroneously allowed. See id. ("[A]lthough we have characterized arguments using metaphors for a defendant such as 'animal' and 'snake' as 'unnecessary and undesirable,' we have held that allowing them is not reversible error." (citation omitted)).

12. Spears argues that the trial court's sentencing phase charge would have led the jurors to believe that unanimity was required in order to find mitigating circumstances and that the jurors would not have been aware that they could impose a life sentence with the possibility of parole despite their finding one or more statutory aggravating circumstances. Pretermitting the State's argument that this issue was waived at trial, we reject Spears's argument as meritless. The trial court's charge defined mitigating circumstances and informed the jury that "[e]ach individual juror has the authority to decide for

36

himself or herself what constitutes a mitigating circumstance and to attach whatever significance to that circumstance as he or she feels is appropriate," that no mitigating circumstances were necessary for a sentence of life with the possibility of parole, that the jury would be "authorized to sentence the defendant to life in prison" even if it found one or more statutory aggravating circumstances, and that the jury could "fix the penalty at life in prison if [it saw] fit to do so for any reasons satisfactory to [it] or without any reason." The trial court instructed the jury on the precise language that it should use on its verdict form if it decided to impose a sentence of life. The trial court's subsequent charge on the form of the verdict if the jury decided to impose a sentence of life without parole or death did not contradict this charge regarding a verdict of life. In fact, after the charge on the form of the verdict regarding life without parole or death, the trial court again charged the jury that it could "impose the penalty of life for no reason or any reason which [was] satisfactory to [it]." The trial court's sentencing phase jury charge, taken as a whole, would not have misled the jurors regarding how to reach and record their sentencing verdict, and more specifically, it would not have misled the jurors to think that unanimity was required to find a mitigating circumstance. See Palmer v. State, 271 Ga. 234,

37

238 (6) (517 SE2d 502) (1999) (noting that a sentencing phase jury charge should be evaluated as a whole). Furthermore, contrary to Spears's further argument, the charge clearly did not constitute a personal expression of opinion by the trial court. Cf. McMillan v. State, 253 Ga. 520, 523 (4) (322 SE2d 278) (1984) ("Any personal expression of opinion by the trial court [in a jury charge] as to what has or has not been proved during the course of a trial is reversible error.").

### Sentence Review

13. Upon our review of the record, we conclude that the sentence of death in Spears's case was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See OCGA § 17-10-35 (c) (1).

14. The jury found the existence of two statutory aggravating circumstances: the murder was committed while Spears was engaged in the capital felony of kidnapping with bodily injury and the murder was committed while Spears was engaged in the offense of burglary. See OCGA § 17-10-30 (b) (2). As noted above in footnote 1, the trial court, in response to Spears's motion for a new trial, vacated the jury's finding regarding the statutory aggravating circumstance related to kidnapping with bodily injury because the evidence was

38

insufficient to support a conviction for kidnapping with bodily injury under the definition of that crime that applied at the time of the murder. Cf. Tate v. State, 287 Ga. 364, 365-366 (1) (a) (695 SE2d 591) (2010). However, as Spears acknowledges, this Court has held that an insufficiency of the evidence to support one or more statutory aggravating circumstances found by the jury does not require reversal where a death sentence remains supported by at least one valid statutory aggravating circumstance. See Edenfield v. State, 293 Ga. 370, 392 (13) (744 SE2d 738) (2013) (citing Zant v. Stephens, 462 U. S. 862 (103 SCt 2733, 77 LE2d 235) (1983)). Upon our review of the record, we conclude that the evidence was sufficient to support the jury's finding beyond a reasonable doubt the existence of the statutory aggravating circumstance related to burglary and, thus, that the evidence was sufficient to support the death sentence. See OCGA § 17-10-35 (c) (2) (requiring a review of the statutory aggravating circumstances found by the jury); Unified Appeal Procedure IV B. 2. (providing that, in all death penalty cases, this Court will determine whether the verdicts are supported by the evidence). See also Ring v. Arizona, 536 U. S. 584 (122 SCt 2428, 153 LE2d 556) (2002); Jackson, 443 U. S. at 319 (III) (B).

15.  Considering both the crimes and the defendant, we conclude that the death sentence in Spears's case is not disproportionate punishment within the meaning of Georgia law.  See OCGA § 17-10-35 (c) (3); Gissendaner, 272 Ga. at 716-717 (19) (a) (stating that this Court's statutorily mandated proportionality review concerns whether a particular death sentence "is excessive per se" or is "substantially out of line" for the type of crime involved).  The cases listed in the Appendix support this conclusion in that each shows a jury's willingness to impose a death sentence in a case involving a murder committed with significant premeditation during a burglary.  See OCGA § 17-10-35 (e).

Judgment affirmed in part and vacated in part, and case remanded with direction.  All the Justices concur.

Appendix.

Rice v. State, 292 Ga. 191 (733 SE2d 755) (2012); Tate v. State, 287 Ga. 364 (695 SE2d 591) (2010); Stinski v. State, 286 Ga. 839 (691 SE2d 854) (2010); O'Kelley v. State, 284 Ga. 758 (670 SE2d 388) (2008); Lewis v. State, 277 Ga. 534 (592 SE2d 405) (2004); Sallie v. State, 276 Ga. 506 (578 SE2d 444) (2003); Raheem v. State, 275 Ga. 87 (560 SE2d 680) (2002), overruled on unrelated grounds by Patel v. State, 282 Ga. 412 (651 SE2d 55) (2007); Lance v. State, 275 Ga. 11 (560 SE2d 663) (2002); Fults v. State, 274 Ga. 82 (548 SE2d 315) (2001); Heidler v. State, 273 Ga. 54 (537 SE2d 44) (2000); Morrow v. State, 272 Ga. 691 (532 SE2d 78) (2000); Pye v. State, 269 Ga. 779 (505 SE2d 4) (1998).

Decided February 16, 2015.

Murder. Lumpkin Superior Court. Before Judge Miller.

Mitchell D. Durham, Stockton & Stockton, Lawrence A. Stockton, Jr., for appellant.

W. Jeff Langley, District Attorney, Dana E. Weinberger, Assistant District Attorney, Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Sabrina D. Graham, Assistant Attorney General, for appellee.